# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Braintree Electric Light Department,                )
Concord Municipal Light Plant,                       )
Georgetown Municipal Light Department,       )
Hingham Municipal Lighting Plant,               )        Case No. 21-1224
Littleton Electric Light Department,               )
Middleborough Gas & Electric Department,   )
Middleton Electric Light Department,             )
Norwood Light & Broadband Department,       )
Reading Municipal Light Department,             )
Taunton Municipal Lighting Plant,                 )
Wellesley Municipal Light Plant, and            )
Westfield Gas & Electric Department             )
                                                                           )
                          Petitioners,                          )
                                                                           )
            v.                                                           )
                                                                           )
Federal Energy Regulatory Commission,       )
                                                                           )
                          Respondent.                         )

## PETITION FOR REVIEW

Pursuant to Section 313(b) of the Federal Power Act, (16 U.S.C. §§ 791a

through 828c (the "FPA), 16 U.S.C. § 825*l*(b)) and Rule 15(a) of the Federal

Rules of Appellate Procedure, Braintree Electric Light Department

("Braintree"), Concord Municipal Light Plant ("Concord"), Georgetown

Municipal Light Department ("Georgetown"), Hingham Municipal Lighting

Plant ("Hingham"), Littleton Electric Light & Water Department ("Littleton"),

Middleborough Gas & Electric Department ("Middleborough"), Middleton Electric Light Department ("Middleton"), Norwood Light & Broadband Department ("Norwood"), Reading Municipal Light Department ("Reading"), Taunton Municipal Lighting Plant ("Taunton"), Wellesley Municipal Light Plant ("Wellesley"), and Westfield Gas & Electric Department ("Westfield") (collectively,  the "Eastern New England Consumer-Owned Systems") petition this Court for review of the following Order and Notice issued by the Federal Energy Regulatory Commission (the "Commission") in Docket No. ER18-1639-000 *et seq. – Constellation Mystic Power, LLC*:

> Order Setting Base ROE in *Constellation Mystic Power, LLC*, Docket No. ER18-1639-000, 176 FERC ¶ 61,019 (issued July 15, 2021) (the "July 15 Order") (copy attached as Exhibit 1); and

> Notice of Denial of Rehearings by Operation of Law and Providing for Further Consideration in *Constellation Mystic Power, LLC*, Docket No. ER18-1639-010, 176 FERC ¶ 62,127 (issued Sept. 13, 2021) (the "September 13 Notice") (copy attached as Exhibit 2).

Braintree, Concord, Georgetown, Hingham, Littleton, Middleborough, Middleton, Norwood, Reading, Taunton, Wellesley, and Westfield are each municipal light plants, organized under the laws of Massachusetts (MGL c. 164, §§ 34-69, as amended), and engaged in providing retail electric service within their respective communities. Each of the foregoing Petitioners was a party to

the proceedings before the Commission resulting in the issuance of the Order and Notice. The Petitioners timely and jointly requested rehearing of the Commission's July 15 Order.

The Order and Notice authorize a return on common equity of 9.33 percent for Constellation Mystic Power, LLC under its Amended and Restated Cost of Service Agreement with ISO New England, Inc. ("ISO-NE") with respect to the Mystic 8 and 9 generating units. The return on common equity authorized in the Order and Notice substantially exceeds the just and reasonable return required by the FPA, and the determination of the Commission to award that level of return is not supported by substantial evidence or reasoned decision making, as required by the FPA and the Administrative Procedure Act (5 U.S.C. §§ 701-706). Each of the foregoing Petitioners is a participant in the wholesale markets administered by ISO-NE, and each has a Real-Time Load Obligation to which the excessive costs imposed by the Commission's Order and Notice will be allocated. The Petitioners and their consumer-owners will incur unjust and unreasonable costs due to the excessive ROE authorized by the Commission in the Order and Notice for which this Petition seeks this Court's review, and are therefore aggrieved by the Order and the Notice. The Commission's September 13 Notice acknowledges that given "the absence of Commission action on the requests for rehearing within 30 days from the date

the requests were filed, the requests for rehearing (and any timely requests for rehearing filed subsequently) may be deemed denied.

Respectfully submitted,

*/s/ John P. Coyle*

_____

John P. Coyle (Cir. Bar No. 32182)
Duncan & Allen LLP
Suite 700
1730 Rhode Island Avenue NW
Washington, D.C.  20036-3115
Telephone:  (202) 289-8400
Email: jpc@duncanallen.com

Counsel for Braintree, Concord, Georgetown, Hingham, Littleton, Middleborough, Middleton, Norwood, Reading, Taunton, Wellesley, and Westfield (the "Eastern New England Consumer-Owned Systems")

Dated at Washington, D.C.
this 10th day of November 2021.

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Braintree Electric Light Department, | ) | |
| Concord Municipal Light Plant, | ) | |
| Georgetown Municipal Light Department, | ) | |
| Hingham Municipal Lighting Plant, | ) | Case No. _____ |
| Littleton Electric Light Department, | ) | |
| Middleborough Gas & Electric Department, | ) | |
| Middleton Electric Light Department, | ) | |
| Norwood Light & Broadband Department, | ) | |
| Reading Municipal Light Department, | ) | |
| Taunton Municipal Lighting Plant, | ) | |
| Wellesley Municipal Light Plant, and | ) | |
| Westfield Gas & Electric Department | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| Respondent. | ) | |

## EXHIBIT NO. 1
### TO PETITION FOR REVIEW

## Order Setting Base ROE in Constellation Mystic Power, LLC, Docket No. ER18-1639-000, 176 FERC ¶ 61,019 (issued July 15, 2021) (the "July 15 Order")

176 FERC ¶ 61,019
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

| | |
|---|---|
| Constellation Mystic Power, LLC | Docket No. ER18-1639-000 |

ORDER SETTING BASE ROE

(Issued July 15, 2021)

### Table of Contents

Paragraph Numbers

I.   Background ................................................................................................- 4 -
 A.   Mystic 8 and 9 .....................................................................................- 4 -
 B.   ROE Methodology Developments .......................................................- 5 -
  1.   Emera Maine .....................................................................................- 5 -
  2.   Briefing Orders .................................................................................- 8 -
  3.   Opinion Nos. 569, 569-A, and 569-B ..............................................- 9 -
II.  Overview ...................................................................................................- 10 -
III. Determination of the Just and Reasonable ROE for a Single Utility ........- 11 -
 A.   Background ...........................................................................................- 11 -
 B.   Whether Mystic is Average Risk ........................................................- 12 -
  1.   Briefs...............................................................................................- 12 -
  2.   Commission Determination .............................................................- 16 -
 C.   Use of Midpoint or Median as Measure of Central Tendency ..........- 17 -
  1.   Briefs...............................................................................................- 17 -
  2.   Commission Determination .............................................................- 19 -
IV.  DCF ..........................................................................................................- 20 -
 A.   Dividend Yield .....................................................................................- 20 -
  1.   Background ......................................................................................- 20 -
  2.   Commission Determination .............................................................- 21 -

B.  Short-Term Growth Rate ................................................................ - 21 -

    1.  Background ................................................................................... - 21 -

    2.  Briefs ............................................................................................ - 22 -

    3.  Commission Determination .......................................................... - 23 -

C.  Long-Term Growth Projection ........................................................ - 23 -

    1.  Background ................................................................................... - 23 -

    2.  Briefs ............................................................................................ - 25 -

    3.  Commission Determination .......................................................... - 25 -

V.  CAPM ................................................................................................. - 26 -

A.  Expected Market Return ................................................................. - 26 -

    1.  Background ................................................................................... - 26 -

    2.  Briefs ............................................................................................ - 28 -

    3.  Commission Determination .......................................................... - 32 -

B.  Betas and Size Premiums ................................................................ - 34 -

    1.  Background ................................................................................... - 34 -

    2.  Briefs ............................................................................................ - 35 -

    3.  Commission Determination .......................................................... - 36 -

VI.  Risk Premium .................................................................................... - 38 -

A.  Background ...................................................................................... - 38 -

B.  Briefs ............................................................................................... - 39 -

C.  Commission Determination ............................................................. - 42 -

VII.  Expected Earnings ............................................................................. - 43 -

A.  Background ...................................................................................... - 43 -

B.  Briefs ............................................................................................... - 46 -

C.  Commission Determination ............................................................. - 49 -

VIII.  Outlier Tests and Natural Break Analysis ...................................... - 50 -

A.  High-End Outlier Test ..................................................................... - 50 -

    1.  Background ................................................................................... - 50 -

    2.  Briefs ............................................................................................ - 51 -

    3.  Commission Determination .......................................................... - 52 -

B.  Low-End Outlier Test ...................................................................... - 53 -

    1.  Background ................................................................................... - 53 -

2.    Briefs..................................................................................................- 54 -

3.    Commission Determination .................................................................- 55 -

C.    Natural Break Analysis..........................................................................- 56 -

1.    Background ........................................................................................- 56 -

2.    Commission Determination .................................................................- 57 -

IX.    Proxy Group Selection .................................................................................- 57 -

A.    Mystic's Proposed Revenue Screen .......................................................- 58 -

1.    Briefs..................................................................................................- 58 -

2.    Commission Determination .................................................................- 59 -

B.    Proposed Exclusion of Electric-Only Utilities........................................- 59 -

1.    Briefs..................................................................................................- 59 -

2.    Commission Determination .................................................................- 60 -

C.    Avangrid ................................................................................................- 61 -

1.    Briefs..................................................................................................- 61 -

2.    Commission Determination .................................................................- 62 -

D.    Dominion and Sempra ...........................................................................- 63 -

1.    Briefs..................................................................................................- 63 -

2.    Commission Determination .................................................................- 65 -

E.    Edison International................................................................................- 65 -

1.    Briefs..................................................................................................- 65 -

2.    Commission Determination .................................................................- 66 -

X.    Results ........................................................................................................- 66 -

A.    Composition of the Starting Proxy Group ..............................................- 66 -

B.    DCF Analysis .........................................................................................- 66 -

C.    CAPM Analysis......................................................................................- 67 -

D.    Risk Premium .......................................................................................- 68 -

E.    Just and Reasonable ROE ......................................................................- 68 -

Document Accession #: 20210715-3076          Filed Date: 07/15/2021
Docket No. ER18-1639-000                                                   - 4 -

1.     On December 20, 2018, the Commission accepted, subject to condition, an executed cost-of-service agreement among Constellation Mystic Power, LLC (Mystic), Exelon Generation Company, LLC (Exelon), and ISO New England Inc. (ISO-NE) that provides cost-of-service compensation to Mystic for continued operation of the Mystic 8 and 9 natural gas-fired generating units (Mystic 8 and 9) (Mystic Agreement).[1]  The Commission also directed a paper hearing on the issue of return on equity (ROE).[2]  Subsequently, in Opinion No. 569 *et seq.*,[3] the Commission adopted a revised methodology for determining just and reasonable base ROEs.  On July 28, 2020, the Commission ordered a second paper hearing to provide an opportunity for parties to address changes to the Commission's ROE methodology.[4]  In this order, we set the base ROE for the Mystic Agreement at 9.33%, as discussed below.

## I.     Background

### A.     Mystic 8 and 9

2.     On May 16, 2018, Mystic filed the Mystic Agreement.  On July 13, 2018, the Commission accepted the Mystic Agreement and suspended it for a nominal period to become effective June 1, 2022, as requested, subject to refund and to the outcome of the section 206 of the Federal Power Act (FPA)[5] proceeding in Docket No. EL18-182-000.[6]  However, while the Commission provided guidance and made certain findings, it set several contested issues for hearing and settlement judge proceedings.[7]  The Commission directed the Presiding Judge to conduct hearing procedures and certify the record to the

---

[1] *Constellation Mystic Power, LLC*, 165 FERC ¶ 61,267 (2018) (December 2018 Order).

[2] *Id.* P 2.

[3] *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, Opinion No. 569, 169 FERC ¶ 61,129 (2019), *order on reh'g*, Opinion No. 569-A, 171 FERC ¶ 61,154, *order on reh'g*, Opinion No. 569-B, 173 FERC ¶ 61,159 (2020).

[4] *Constellation Mystic Power, LLC*, 172 FERC ¶ 61,093 (2020).

[5] 16 U.S.C. § 824e.

[6] *See Constellation Mystic Power, LLC*, 164 FERC ¶ 61,022, at P 2 (2018) (July 2018 Order).  On August 31, 2018, ISO-NE submitted proposed interim Tariff revisions, which the Commission accepted on December 3, 2018.  Interim Fuel Security Provisions Order, 165 FERC ¶ 61,202, at P 1 (2018).

[7] July 2018 Order, 164 FERC ¶ 61,022 at PP 19-20, 34-38, 41.

Commission without issuing an initial decision.[8]  On October 12, 2018, the Presiding Judge certified the record to the Commission.[9]  Participants then submitted initial briefs and reply briefs to the Commission.

3.      In the December 2018 Order, the Commission accepted the Mystic Agreement, subject to condition, to become effective June 1, 2022.  Relevant here, in that order, the Commission directed additional briefing on the issue of the appropriate ROE for the term of the Mystic Agreement.  On April 19, 2019, Connecticut Parties,[10] Eastern New England Consumer-Owned Systems (ENECOS), Massachusetts Attorney General (Massachusetts AG), Mystic, and Trial Staff filed initial briefs.  On July 18, 2019, Connecticut Parties, ENECOS, Massachusetts AG, Mystic, National Grid USA, and Trial Staff filed reply briefs.  On August 2, 2019, Mystic filed a letter clarifying its July 18, 2019 reply brief.

## B.      ROE Methodology Developments

### 1.      Emera Maine

4.      In 2014, the Commission issued Opinion No. 531,[11] which addressed complaints challenging the ROE of the New England transmission owners (New England TOs).  In Opinion No. 531, the Commission adopted certain changes to its use of the discounted cash flow (DCF) model for evaluating and setting the Commission-allowed ROE.  In particular, the Commission elected to replace the "one-step" DCF model, which considers only short-term growth projections for a public utility, with a "two-step" model that considers both short- and long-term growth projections by providing 33% weighting to long-term gross domestic product (GDP) growth.[12]  The Commission also departed

---

[8] *Id*. P 12.

[9] Certification of Record, Constellation Mystic Power, LLC, Docket No. ER18-1639-000 (Oct. 12, 2018).

[10] Connecticut Parties consist of Connecticut Public Utilities Regulatory Authority, Connecticut Department of Energy and Environmental Protection, and Connecticut Office of Consumer Counsel.

[11] *Coakley Mass. Attorney Gen. v. Bangor Hydro-Elec. Co*., Opinion No. 531, 147 FERC ¶ 61,234 (2014).

[12] *See generally* Opinion No. 531, 147 FERC ¶ 61,234 at PP 8, 32-41, *order on paper hearing*, Opinion No. 531-A, 149 FERC ¶ 61,032 (2014), *order on reh'g*, Opinion No. 531-B, 150 FERC ¶ 61,165 (2015), *rev'd*, Emera Maine v. FERC, 854 F.3d 9 (D.C. Cir. 2017) (*Emera Maine*).

from its typical practice of setting the just and reasonable ROE of a group of utilities at the midpoint of the zone of reasonableness. The Commission explained that evidence of "anomalous" capital market conditions, including "bond yields [that were] at historic lows," made the Commission "less confiden[t] that the midpoint of the zone of reasonableness . . . accurately reflects the [ROE] necessary to meet the *Hope* and *Bluefield* capital attraction standards."[13]

5.      The Commission therefore looked to four alternative benchmark methodologies: three financial models—a risk premium analysis (Risk Premium); a capital-asset pricing model (CAPM) analysis; and an expected earnings analysis (Expected Earnings)—as well as a comparison with state-allowed ROEs.[14]  In considering those methodologies, the Commission emphasized that it was not departing from its long-standing reliance on the DCF model, but rather relying on those methodologies only to "inform the just and reasonable placement of the ROE within the zone of reasonableness established . . . by the DCF methodology."[15]

6.      On April 14, 2017, the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) issued the *Emera Maine* decision, which vacated and remanded Opinion No. 531 *et seq.*  The D.C. Circuit rejected New England TOs' argument that an ROE within the DCF-produced zone of reasonableness could not be deemed unjust and unreasonable.  The D.C. Circuit explained that the zone of reasonableness established by the DCF is not "coextensive" with the "statutory" zone of reasonableness envisioned by the FPA.[16]  Accordingly, the D.C. Circuit concluded that the fact that New England TOs'

---

[13] Opinion No. 531, 147 FERC ¶ 61,234 at PP 144-145 & n.285.  "*Hope*" and "*Bluefield*" refer to *FPC v. Hope Natural Gas Company*, 320 U.S. 591 (1944) (*Hope*) and *Bluefield Water Works & Improvement Company v. Public Service Commission of West Virginia*, 262 U.S. 679 (1923) (*Bluefield*), respectively, a pair of U.S. Supreme Court cases that require the Commission "to set a rate of return commensurate with other enterprises of comparable risk and sufficient to assure that enough capital is attracted to the utility to enable it to meet the public's needs."  *Boroughs of Ellwood City, Grove City, New Wilmington, Wampum, & Zelienople, Pa. v. FERC*, 731 F.2d 959, 967 (D.C. Cir. 1984) (citing *Hope*, 320 U.S. 591, 603 and *Bluefield*, 262 U.S. 679).

[14] Opinion No. 531, 147 FERC ¶ 61,234 at PP 147-149.

[15] *Id.* P 146.

[16] *Emera Maine*, 854 F.3d at 22-23.

existing ROE fell within the zone of reasonableness produced by the DCF did not necessarily indicate that it was just and reasonable for the purposes of the FPA.[17]

7.      Nevertheless, the D.C. Circuit found that the Commission had not adequately shown that the New England TOs' existing ROE was unjust and unreasonable.  The D.C. Circuit explained that the FPA's statutory "zone of reasonableness creates a broad range of potentially lawful ROEs rather than a single just and reasonable ROE" and that whether a particular ROE is unjust and unreasonable depends on the "particular circumstances of the case."[18]  Thus, the fact that New England TOs' existing ROE did not equal the just and reasonable ROE that the Commission would have set using the current DCF inputs did not necessarily indicate that New England TOs' existing ROE fell outside the statutory zone of reasonableness.[19]  As such, the D.C. Circuit concluded that Opinion No. 531 "failed to include an actual finding as to the lawfulness of [New England TOs'] existing base ROE" and that its conclusion that their existing ROE was unjust and unreasonable was itself arbitrary and capricious.[20]

8.      The D.C. Circuit also found that the Commission had not adequately shown that the 10.57% ROE that it set was just and reasonable.  Although recognizing that the Commission has the authority "to make 'pragmatic adjustments' to a utility's ROE based on the 'particular circumstances' of a case," the D.C. Circuit nevertheless concluded that the Commission had not explained why setting the ROE at the upper midpoint was just and reasonable.[21]  The D.C. Circuit noted, in particular, that the Commission relied on the alternative models and state-allowed ROEs to support a base ROE above the midpoint, but that it did not rely on that evidence to support an ROE at the upper midpoint.[22] Similarly, the D.C. Circuit noted that the Commission had concluded that a base ROE of

---

[17] *Id.* at 23.

[18] *Id.* at 23, 26.

[19] *Id.* at 27 ("To satisfy its dual burden under section 206, FERC was required to do more than show that its single ROE analysis generated a new just and reasonable ROE and conclusively declare that, consequently, the existing ROE was per se unjust and unreasonable.").

[20] *Id.*

[21] *Id.* (quoting *FPC v. Nat. Gas Pipeline Co.*, 315 U.S. 575, 586 (1942)).

[22] *Id.* at 29 ("FERC's reasoning is unclear.  On the one hand, it argued that the alternative analyses supported its decision to place the base ROE above the midpoint, but on the other hand, it stressed that none of these analyses were used to select the 10.57% base ROE.").

9.39%—the midpoint of the zone of reasonableness—might not be sufficient to satisfy *Hope* and *Bluefield* or to allow the utility to attract capital, but that the Commission had not similarly explained how a 10.57% base ROE was sufficient to meet either of those conditions.  Because the D.C. Circuit found that the Commission had not pointed to record evidence supporting the specific point at which it set New England TOs' ROE, the D.C. Circuit held that the Commission had not articulated the "rational connection" between the evidence and the rate that the FPA demands.[23]

## 2.  Briefing Orders

9.      In response to the D.C. Circuit's decision, the Commission issued, on October 16, 2018, an order that directed the participants to the proceeding that was the subject of *Emera Maine*, and the participants in three other proceedings involving New England TOs' ROE, to submit briefs regarding:  (1) a proposed framework for determining whether an existing ROE is unjust and unreasonable under the first prong of FPA section 206; and (2) a revised methodology for determining just and reasonable ROEs under the second prong of FPA section 206.[24]  In the *Coakley* Briefing Order, the Commission proposed to change its approach to determine base ROE by giving equal weight to four financial models, instead of primarily relying on the DCF methodology.  The Commission stated that evidence indicates that investors do not rely on any one model to the exclusion of others.  Therefore, the Commission explained that relying on multiple financial models makes it more likely that the Commission's decision will accurately reflect how investors make their investment decisions.  Specifically, for purposes of establishing a new just and reasonable base ROE, the Commission proposed to use the DCF, CAPM, and Expected Earnings models, plus the Risk Premium model. For an average risk single utility, the Commission proposed to determine the median of each zone of reasonableness produced by the DCF, CAPM, and Expected Earnings models and average those ROEs with the Risk Premium ROE, giving equal weight to each of the four figures.  The Commission also proposed to use the medians of the lower and upper halves of the zones of reasonableness to determine ROEs for single utilities of below and above average risk, respectively.[25]

10.     Finally, the Commission proposed to largely use the same proxy group screening criteria as outlined in Opinion No. 531.  However, the Commission proposed to apply a high-end outlier test to the results of the CAPM, Expected Earnings, and DCF analyses, noting among other things that neither the CAPM nor Expected Earnings analyses

---

[23] *Id.* at 28-30.

[24] *See Coakley v. Bangor Hydro-Elec. Co.*, 165 FERC ¶ 61,030, at PP 1, 15 (2018) (*Coakley* Briefing Order).

[25] *Id.* PP 17, 27 n.62.

Document Accession #: 20210715-3076          Filed Date: 07/15/2021
Docket No. ER18-1639-000                                                                    - 9 -

include a long-term growth projection based on GDP that would normalize the ROEs produced by the model.  The Commission proposed to treat as high-end outliers any proxy company whose cost of equity estimated with a given model is more than 150% of the median result of all of the potential proxy group members in that model before any high or low-end outlier test is applied.  This would be subject to a natural break analysis, similar to the approach the Commission uses for low-end DCF analysis results.[26]

11.      The Commission subsequently issued a similar briefing order in the case involving the Midcontinent Independent System Operator, Inc. (MISO) transmission owners' ROE, in which it explained that, as in the *Coakley* Briefing Order involving the New England TOs' ROE, the "scope of the paper hearing established in [the MISO transmission owners' briefing order] includes all aspects of [the] proposed methodology."[27]  The briefing order in the instant proceeding proposed the same framework and similarly requested briefs addressing the framework.[28]  Initial briefs were filed on April 19, 2019 and reply briefs were filed on July 18, 2019.  On July 28, 2020, the Commission ordered a second paper hearing to provide an opportunity for parties to address changes to the Commission's ROE methodology that were implemented in Opinion Nos. 569 and 569-A.[29]  Initial briefs were filed on September 28, 2020 and reply briefs were filed on October 28, 2020.

### 3.      Opinion Nos. 569, 569-A, and 569-B

12.      In Opinion No. 569, as modified by Opinion Nos. 569-A and 569-B, the Commission adopted the proposal in the *Coakley* Briefing Order, with certain revisions. In particular, the Commission applied the DCF, CAPM, and Risk Premium models in its determinations under the first and second prongs of FPA section 206, giving each model equal weight under both prongs, and did not use the Expected Earnings model, as proposed in the *Coakley* Briefing Order.  In addition, the Commission made numerous clarifications regarding the implementation of the DCF, CAPM, and Risk Premium models.  For instance, the Commission employed historical bond yields[30] in the Risk Premium model under both prongs of the analysis of a challenged base ROE under FPA

---

[26] *Id.* P 53.

[27] *Ass'n of Bus. Advocating Tariff Equity v. Midcontinent Indep. Sys. Operator, Inc.*, 165 FERC ¶ 61,118, at P 20 (2018).

[28] December 2018 Order, 165 FERC ¶ 61,267 at PP 31-34.

[29] *Constellation Mystic Power, LLC*, 172 FERC ¶ 61,093 at PP 1-2.

[30] *See* Opinion No. 569-B, 173 FERC ¶ 61,159 at PP 3, 121, 127-128.

section 206,[31] gave the short-term growth rate 80% weighting and the long-term growth rate 20% weighting in the two-step DCF model, and established the high-end outlier test to treat any proxy company as a high-end outlier if its cost of equity estimated under the model in question is more than 200% of the median result of all of the potential proxy group members in that model[32] before any high or low-end outlier test is applied, subject to a natural break analysis. The Commission used the Institutional Brokers' Estimate System (IBES) as the source of short-term earnings growth estimates in the DCF and CAPM, used a revised low-end outlier test that eliminates DCF and CAPM proxy group ROE results that are less than the yields of generic corporate Baa bonds plus 20% of the CAPM risk premium. However, the Commission stated that it would consider the use of *Value Line* short-term earnings growth estimates in the CAPM in future proceedings. The Commission also used the ranges of presumptively just and reasonable ROEs in its analysis of whether an existing ROE is unjust and unreasonable under the first prong of FPA section 206 and established the range of presumptively just and reasonable ROEs by dividing the overall composite zone of reasonableness into equal thirds.

## II.    Overview

13.    The six-month test period for the proceeding is April 1, 2018 to September 30, 2018.[33]

14.    As discussed below, we apply the revised base ROE methodology that was adopted in Opinion No. 569, as modified in Opinion Nos. 569-A and 569-B, to this proceeding. In Opinion No. 569-A, the Commission noted that, in future proceedings, "parties will have an opportunity to argue that the base ROE methodology . . . should be modified or applied differently because of the specific facts and circumstances of the proceeding involving that party."[34] However, as discussed below, we find that no party has demonstrated that the methodology applied in those proceedings  should not be applied to the facts and circumstances of this proceeding.

---

[31] In order to be used for the first prong under FPA section 206, the Commission used the average size of the zones of reasonableness under the DCF and CAPM to impute a zone of reasonableness around the point estimate produced by the Risk Premium model. *See* Opinion No. 569-A, 171 FERC ¶ 61,154 at P 107.

[32] As noted below, the high-end outlier test only applies to the DCF model and CAPM because they utilize results of the relevant analysis applied to a proxy group, while the Risk Premium model is derived from actual ROEs.

[33] *Constellation Mystic Power, LLC*, 172 FERC ¶ 61,093 at P 16.

[34] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 27.

15.     Unlike in the Opinion No. 569 *et seq.* proceeding, in which the Commission determined the just and reasonable ROE for a group of utilities, here we evaluate the just and reasonable ROE for a single utility.  As discussed below, we apply the revised ROE methodology to the facts of this case using the average of:  (1) the median result of the DCF model; (2) the median result of the CAPM; and (3) the point estimate of the Risk Premium and find that the just and reasonable base ROE for the Mystic Agreement is 9.33%.

## III.   Determination of the Just and Reasonable ROE for a Single Utility

### A.   Background

16.     In determining the central tendency of the zone of reasonableness, the Commission has distinguished between cases involving an RTO-wide ROE and cases involving the ROE of a single utility.  In cases involving an RTO-wide ROE, the Commission has held that the midpoint is an appropriate representation of the central tendency of the zone of reasonableness.  The Commission has reasoned that, because an RTO-wide ROE will apply to a diverse set of companies, the range of results becomes as important as the central value, and the midpoint fully considers that range, because it is derived directly from the endpoints of the range.  In Opinion No. 569, as upheld in Opinion No. 569-A, the Commission held that it will continue to use the midpoint to determine the central tendency of the zone of reasonableness in cases involving an RTO-wide ROE.  The Commission stated that the United States Court of Appeals for the District of Columbia upheld that policy in *Public Service Commission of Kentucky v. FERC*.[35]  By contrast, in cases involving a single utility, the Commission has held that using the median is appropriate, because the median "is the most accurate measure of central tendency for a single utility of average risk."[36]  In the *Coakley* Briefing Order, the Commission proposed to continue to use the median as the measure of central tendency for a single utility of average risk and the medians of the lower and upper halves of the zone of reasonableness to determine ROEs for single utilities of below and above average risk, respectively.[37]

---

[35] Opinion No. 569, 169 FERC ¶ 61,129 at P 409 (citing *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004 (D.C. Cir. 2005)).

[36] *See Southern California Edison Co*., 131 FERC ¶ 61,020, at P 91 (2010) (*S. Cal Edison*), *remanded on other grounds sub nom. S. Cal. Edison Co. v. FERC*, 717 F.3d 177, 183-87 (D.C. Cir. 2013) (*S. Cal. Edison v. FERC*).

[37] *Coakley* Briefing Order, 165 FERC ¶ 61,030 at P 17 n.46, P 27 n.62.

## B.    **Whether Mystic is Average Risk**

### 1.    **Briefs**

17.    Mystic argues that it is "undeniably riskier than the proxy group" because it is "a merchant generator whose only assets during the relevant time period will be two gas-fired generators in a single location."[38]  Mystic asserts that a proxy group is not representative of its risk profile because "the proxy group consists of electric utilities with diversified activities and markets" and adds that "[d]iversified companies . . . can more easily sustain downturns in one market or another."[39]  Mystic disputes assertions by other parties that operating on a two-year cost-of-service agreement lowers the risks to Mystic.[40]  Furthermore, Mystic contends that "bond ratings of merchant generators support the conclusion that Mystic, as a merchant generator, is riskier than the proxy group companies."[41]  Mystic explains that Exelon Generation Company (Exelon Generation), its indirect parent, has the same bond ratings (BBB and Baa2) as Exelon Generation's parent Exelon Corp. (Exelon) despite having materially different equity ratios because Exelon is a diversified energy company whereas Exelon Generation is a merchant generator.[42]  Therefore, Mystic asserts, "[t]hat Exelon Generation's bond ratings are the same as Exelon's is a reflection of the fact that merchant generation is a riskier venture and is required by the market to maintain a higher equity ratio to achieve the same bond rating."  Mystic notes that "NRG Energy, Inc., Calpine Corp., and Dynegy Inc. in the data period were all non-investment grade or junk status, while Exelon's S&P rating of BBB and Moody's rating of Baa2 are investment grade and at least four notches above any of these merchant generators' credit ratings."[43]

18.    Mystic argues that the Mystic Agreement creates several additional risks.  First, Mystic argues that investors do not rely on two-year time horizons to gauge the riskiness of an investment.  Second, Mystic asserts that the Mystic Agreement comes with a

---

[38] Mystic Initial Brief at 17 (citing Exhibit Nos. MYS-0010 at 8, 12; and MYS-0029 at 6).

[39] *Id.* at 17 (citing Exhibit No. MYS-0010 at 17); *see also* Mystic Reply Brief at 17-18.

[40] Mystic Reply Brief at 19-21.

[41] Mystic Initial Brief at 17.

[42] Exelon's equity ratio is 47.6% and Exelon Generation's equity ratio is 67.3%. Mystic Initial Brief at 17.

[43] *Id.* at 18.

Document Accession #: 20210715-3076     Filed Date: 07/15/2021

significant risk of under-recovery because Mystic, as a capacity resource, will be subject to a Pay for Performance (PFP) penalty under the ISO-NE Tariff as well as a Winter Fuel Security Penalty during certain months.[44]  Mystic notes that a 2018 PFP event that lasted less than three hours cost Mystic 8 and 9 approximately $3.6 million and argues that, if a similar event occurs in January 2023, Mystic 8 and 9's total penalty exposure would be over $16.5 million.[45]  Mystic also contends that section 3.3 of the Mystic Agreement, which prohibits Mystic from purchasing replacement capacity to mitigate its risk of non-performance except when Mystic is on an ISO-NE-approved Planned Outage or on a Forced Outage where ISO-NE has approved the purchase of replacement capacity, inhibits Mystic's ability to mitigate its PFP risk.  Additionally, Mystic declares that its fuel supply through, and associated ownership of, the Everett Marine Terminal LNG import facility (Everett) "puts Mystic in a risk class of its own."[46]  Specifically, Mystic argues that LNG is often sourced from nations with political unrest, that "delivery of LNG to Everett involves highly complex logistics," and that "[t]he operating restrictions of Boston Harbor further complicate LNG delivery," all of which increase the uncertainty for Mystic's dispatch and, in turn, the risks to Mystic.[47]

19.     Mystic states that Exelon intends to retire Mystic 8 and 9 at the end of the Mystic Agreement and asserts that "significant undepreciated costs will go unrecovered, " further noting that Mystic is subject to a "clawback" provision that operates to prevent the units from reentering the market.[48]  Therefore, Mystic argues, "the inability of Mystic to recover its costs sets Mystic apart from the proxy group . . . [and] even from other generators" and justifies finding that Mystic is riskier than the proxy group.[49]

20.     Trial Staff argues that Mystic's risk level is not above average, noting that the December 2018 Order allows Mystic to recover its costs, including 91% of the costs of the Everett LNG terminal, and that Mystic has the option to operate at market-based rates after the end of the Mystic Agreement.[50]  Trial Staff disagrees with Mystic's arguments that its risk is higher than other electric utilities in the sample because Mystic is a

---

[44] *Id.* at 19.

[45] *Id.* at 19-20 (citing Affidavit of Mr. William B. Berg at 5-6).

[46] *Id.* at 20.

[47] *Id.* at 20-22.

[48] *Id.* at 22-23.

[49] *Id.* at 23.

[50] Trial Staff Initial Brief at 8 (citing Affidavit of Ms. Marina J. Fishbein at P 16).

merchant generator, noting that Mystic will receive cost-of-service compensation under the Mystic Agreement and will not be exposed to wholesale electricity market prices. Therefore, Trial Staff argues, the bond ratings of merchant generators are an inappropriate comparison for Mystic.[51]  Trial Staff notes that the provisions of the Mystic Agreement that Mystic claims increase its risk, such as the clawback mechanism and non-performance penalties, are designed to counterbalance the guaranteed cost recovery and incentives for third party sales in the Mystic Agreement and do not increase Mystic's risk.[52]  Trial Staff disagrees with Mystic's argument that the two-year period of the agreement increases Mystic 8 and 9's risk, noting that the Commission's ROE methodology does not consider the length of time that the rate will be in place and that all ROEs established under the Commission's methodology are on a forward-looking basis and for an indefinite period.  Likewise, Trial Staff disagrees with Mystic's arguments that it will not be able to recover undepreciated costs, noting that Mystic had already filed to retire Mystic 8 and 9; therefore, Mystic would have considered any such costs of undepreciated assets before deciding to submit its Retirement De-List Bid.[53]

21.     ENECOS states that Mystic 8 and 9 face "substantially less risk than that typically confronting a competitive generator" because the Mystic Agreement is a cost-of-service agreement.[54]  ENECOS disputes Mystic's statements that Mystic 8 and 9 have the risk profile of merchant generators and point to testimony from Mystic witness Dr. Michael J. Vilbert stating that "the risk of operating under an RMR is of slightly less than the risk of an integrated electric utility."[55]  Similarly, ENECOS disputes Mystic's argument related to Exelon's and Exelon Generation's bond ratings, stating "[w]here a subsidiary faces less risk than its parent because it has a formula cost-of-service tariff and a contractually guaranteed market to purchase its output, the rate of return should be adjusted accordingly."[56]  ENECOS disagrees with Mystic's assertions that the two-year period of the Mystic Agreement raises the risk of Mystic, explaining the period is equivalent to investing in a two-year bond and noting that Mystic will be able to recover costs that it

---

[51] *Id.* at 20-21.

[52] *Id.* at 22-25, 28-30.

[53] *Id.* at 25-27.

[54] Mystic Initial Brief at 4.

[55] ENECOS Reply Brief at 29 (citing Prepared Direct Testimony of Michael J. Vilbert on behalf of Mystic Development, LLC, Docket No. ER06-427-003, August 18, 2006).

[56] *Id.* at 30.

Document Accession #: 20210715-3076     Filed Date: 07/15/2021

would not have recovered had Mystic 8 and 9 been able to retire with the submission of Mystic's Retirement De-List Bid.[57]

22.     Connecticut Parties state that Mystic is an average risk utility and disagree with Mystic's assertion that it will not be a merchant generator during the Mystic Agreement term.  Connecticut Parties disagree with Mystic's claim that as a cost-of-service-regulated generator, it will face risks greater than the utility companies in its proxy group because of ISO-NE's PFP program.  Connecticut Parties argue that PFP poses less risk for Mystic during the cost-of-service agreement term than it does to any other capacity resource in ISO-NE because Mystic is able to true-up revenues and costs to ensure that the rates ultimately charged by Mystic allow Mystic to recover its prudently incurred costs.[58]

23.     Massachusetts AG argues that the record in this proceeding conclusively establishes that, during the term of the Mystic Agreement, Mystic will face risks similar to those faced by the proxy group companies.[59]  Massachusetts AG argues that Mystic incorrectly builds its risk argument largely on precedent and evidence that is only applicable to merchant generation.  Massachusetts AG argues that it is beyond dispute that, during the term of the Mystic Agreement, Mystic will not be operating as a merchant generator nor in any competitive market.[60]  Massachusetts AG argues that the change in Mystic's risk profile during the term of the Mystic Agreement is no different or more complicated than the changing market conditions that *Hope* and *Bluefield* recognize drive whether or not a return is just and reasonable.[61]

24.     Massachusetts AG argues that Mystic is the only party with control over whether Mystic fails to satisfy the requirements of the provisions of the Mystic Agreement or triggers penalties.  Massachusetts AG argues that Mystic voluntarily accepted these responsibilities in exchange for receiving two additional years of compensation on facilities it otherwise would have retired, making it clear that an increased ROE is not necessary to ensure Mystic is fairly compensated.  Massachusetts AG argues that, under the Agreement, Mystic will receive two years' worth of compensation, including a guaranteed rate of return, despite the fact that the units are only critically needed for a few months each winter.  Massachusetts AG argues that the provisions discussed above are specifically designed to ensure that Mystic is ready during these critical times, and if

---

[57] *Id.* at 31-33.

[58] Connecticut Parties Reply Brief at 7-8.

[59] Massachusetts AG Reply Brief at 21-22.

[60] *Id.* at 24.

[61] *Id.* at 26.

Document Accession #: 20210715-3076     Filed Date: 07/15/2021

not, that it will not receive a windfall by retaining this compensation despite failing to perform.[62]

25.     Massachusetts AG argues that Mystic's claims that the clawback in the Mystic Agreement supports a higher return is without merit.  Massachusetts AG argues that, as a threshold matter, the clawback provision only becomes operative if Mystic seeks to reenter the market after the Agreement, which, according to Mystic's parent, will not happen here.  Massachusetts AG argues that failure to include a clawback would unjustly enrich Mystic at the expense of ratepayers and other market participants and would therefore distort the markets and undermine grid reliability.[63]  Massachusetts AG argues that Mystic's arguments here seek to shift to ratepayers risks associated with business decisions that are both beyond the scope of the Agreement and wholly within Mystic's control.  Massachusetts AG states that these arguments cannot be reconciled with the fact that Mystic had already decided to retire these units in the spring of 2022.  Massachusetts AG asserts that Mystic made the business decision to retire in the Spring of 2022, fully understanding that such a decision would result in stranded costs it could not recover.  Massachusetts AG argues that the retention of these units under the terms of the Mystic Agreement therefore actually *reduces* the amount of stranded costs by providing two years of additional cost recovery.[64]

## 2.    Commission Determination

26.     We find that Mystic 8 and 9 will be of average risk.  As several parties note, Mystic 8 and 9 will be operating under a cost-of-service agreement that allows Mystic to recoup almost all of its prudently incurred costs during the period.  Therefore, Mystic does not face a comparable risk profile to that of a merchant generator, whose revenues are comparatively much more variable and unpredictable.  Mystic argues that the bond ratings of Exelon and Exelon Generation demonstrate that Exelon Generation experiences greater risks than Exelon because Exelon Generation is a merchant generator.  However, we disagree that Mystic will be operating as a merchant generator under the Mystic Agreement.  Therefore, Exelon Generation's bond rating is not the relevant benchmark because Mystic 8 and 9 will be operating on a cost-of-service basis during the term of the agreement.  The Commission does not generally determine the ROE based on the risk of individual contracts or assets but rather bases ROE placement in the zone and proxy group composition on the entire operating company's risk.  However, in this case, Mystic's cost recovery method and associated risk fundamentally differs from that of

---

[62] *Id.* at 31.

[63] *Id.* at 33.

[64] *Id.* at 32.

most elements of the operating company, Exelon Generation, such that the Commission should evaluate its independent risk profile.

27.    Mystic claims that it faces increased risks because it will not be able to recover certain undepreciated costs due to the two-year term of the agreement.  However, as multiple parties note, had Mystic 8 and 9 retired when Mystic submitted its Retirement De-List Bid, Mystic would nonetheless not have been able to recover such costs. Therefore, the risk of not recovering undepreciated costs was already present when Mystic submitted its Retirement De-List Bid.  Furthermore, the Mystic Agreement provides Mystic with an opportunity to reduce these stranded costs; the Mystic Agreement does not create the costs.  Mystic also contends that the two-year period of the agreement introduces additional risk because it is shorter than the investment horizon for equity investors.  However, as Trial Staff notes, the Commission's ROE methodology does not consider the time horizon of the investment and assumes that all rates are for an indefinite future period.  Therefore, the fact that the Mystic Agreement has a two-year term is irrelevant to the question of the just and reasonable ROE.

28.    Additionally, Mystic argues that PFP and the Winter Fuel Security Penalty increase its risk profile.  However, as multiple parties note, the Mystic Agreement contains penalties for poor performance as well as guarantees for cost recovery and incentives for positive performance.  The penalties are designed to ensure that Mystic 8 and 9 provide the grid reliability that the Mystic Agreement seeks to ensure.  The potential for Mystic to incur penalties does not by itself demonstrate that Mystic 8 and 9 face above average risk.

## C.    Use of Midpoint or Median as Measure of Central Tendency

### 1.    Briefs

29.    Mystic asserts that it is inherently problematic to rely on medians under the Order No. 569-A methodology because there may be few, or no, proxy group companies in a particular third of the zone of reasonableness.  Therefore, Mystic recommends that the Commission rely on midpoints to determine the just and reasonable ROE.  Mystic witnesses Dr. Vilbert and Mr. Akarsh Sheilendranath also state that relying on the midpoint eliminates the illogical difference between setting the allowed ROE for a single utility and a group of companies.[65]  Mystic further argues that medians cannot be used with the Risk Premium because that model does not produce a range of results.[66]

---

[65] Mystic Initial Brief at 15-16 (citing Brattle Aff. at 14-16).

[66] Mystic Reply Brief at 12.

30.     Trial Staff contends that the facts of this proceeding differ from the facts in
Opinion Nos. 569 and 569-A because the ultimate Commission-approved ROE will apply
in the context of the Mystic Agreement, a modified version of ISO-NE's Appendix I
*pro forma* cost of service agreement for supplying energy, ancillary services, and
capacity, rather than an FPA section 206 proceeding.  Trial Staff notes that the Mystic
Agreement is a modified version of ISO-NE's *pro forma* cost-of-service agreement,
which reduces risk for Mystic by providing for cost recovery for Mystic 8 and 9 and for
the recovery of substantial costs of Everett.[67]  Therefore, according to Trial Staff, only
the second prong of FPA section 206 in Opinion Nos. 569 and 569-A is relevant here
(i.e. the Commission's proposed procedure to determine a specific just and reasonable
ROE).  Trial Staff also argues that protection of consumer interests in this case requires
rates be tailored to meet Mystic's needs, and not more.  As a result, Trial Staff contends
that using the median measure of central tendency is appropriate in this case because
Mystic's risk level does not warrant placing its ROE at a higher level.[68]

31.     Similarly, Connecticut Parties dispute Mystic's proposed use of midpoints, stating
that Mystic is of average risk.  Connecticut Parties note that the use of thirds of the
composite zone of reasonableness in evaluating base ROEs under FPA section 206 is
separate from the analysis in this proceeding.  Furthermore, Connecticut Parties declare
that Mystic's claims of insufficient proxy group companies to use medians stems from
Mystic's own "unprecedented proxy screening criteria that eliminated nearly half of its
proxy group."[69]

32.     ENECOS and Massachusetts AG also encourage the Commission to use the
median to set the just and reasonable ROE for a single utility.[70]  ENECOS witness
Dr. Jonathan A. Lesser states that the "most accurate measure is to set the allowed ROE
to the median value, as the median is a statistically robust measure of central tendency,
whereas the midpoint is not."[71]

---

[67] Trial Staff Initial Brief at 11-12.

[68] *Id.* at 12-13, 35.

[69] Connecticut Parties Reply Brief at 10-11.

[70] ENECOS Reply Brief at 5; Massachusetts AG Reply Brief at 21-22.

[71] ENECOS Reply Brief at 5 (citing Exhibit No. ENC-0408, at 42:13-16).

## 2.    **Commission Determination**

33.    As discussed below, we find that the median is the appropriate measure of central tendency in this proceeding.

34.    In determining where to place the ROE within the zone of reasonableness, the Commission's policy is to use the midpoint of the zone of reasonableness in cases involving an RTO/ISO-wide ROE that applies to a diverse group of utilities.[72]  In contrast, the Commission has employed the median for single utilities of average risk.[73] The rationale for this difference is that, when setting an ROE for a single utility of average risk, the median calculation is superior to a midpoint calculation in determining the central tendency of the zone of reasonableness, because the median gives consideration to more of the proxy group companies and reduces the impact of any single company that has an atypically high or low cost of equity result.  By comparison, when setting the ROE for a diverse group of utilities, the impact of particularly high or low cost of equity estimates is less of a concern because the diverse group of utilities themselves represent a range of equity costs, and giving weight to the full range of results is more likely to produce an ROE that is sufficient for each utility in the diverse group.[74]  We continue to agree with this rationale and therefore find that the median is the appropriate measure of central tendency in this proceeding.

35.    Mystic argues that using the median in the Commission's revised ROE methodology is problematic because there may be few, or no, proxy group companies in a particular third of the zone of reasonableness.  As an initial matter, the Commission does not apply presumptively just and reasonable ranges of ROEs (i.e., the zone of reasonableness thirds to which Mystic refers) when reviewing an ROE that is proposed under FPA section 205.[75]  As Connecticut Parties correctly explain, the Commission uses these risk-adjusted thirds to evaluate existing base ROEs under the first prong of FPA section 206.  In Opinion No. 569, the Commission explained that "using ranges of presumptively just and reasonable ROEs is necessary to ensure that our ROE

---

[72] Opinion No. 569, 169 FERC ¶ 61,129 at P 410 (citing *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d at 1010).

[73] *See Southern California Edison Co.*, 136 FERC ¶ 61,074, at P 30 (2011); *S. Cal. Edison*, 131 FERC ¶ 61,020; *Coakley* Briefing Order, 165 FERC ¶ 61,030 at P 17, P 27 n.62.

[74] *See Midwest Indep. Transmission System Operator*, *Inc.*, 106 FERC ¶ 61,302, at PP 8-15 (2004).

[75] 16 U.S.C. § 824d; *Coakley* Briefing Order, 165 FERC ¶ 61,030 at P 17, 27 n.62.

Document Accession #: 20210715-3076          Filed Date: 07/15/2021

determinations under section 206 meet the requirements of the *Emera Maine* decision."[76] In this proceeding, we are making an ROE determination under section 205 of the FPA— not section 206—and the referenced requirements of the *Emera Maine* decision are not applicable in the section 205 context. Accordingly, ranges of presumptively just and reasonable ROEs will not be used in the methodology that is applied in this proceeding. Therefore, Mystic's criticisms are inapposite because those ranges are not part of the analysis in this FPA section 205 proceeding.

36.     Additionally, regarding Mystic's assertion that a given third of the composite zone of reasonableness may contain few or no proxy group companies, we note that Mystic appears to misunderstand the application of the median to the Commission's ROE methodology as applied in Opinion No. 569 *et seq*. The Commission does not determine a median ROE result for each proxy group company. Instead, when the Commission establishes a just and reasonable ROE for a single utility of average risk, as is the case here, the Commission determines the median result for the DCF and CAPM separately, then averages those two medians with the point estimate of the Risk Premium.[77]

## IV.    DCF

### A.    Dividend Yield

#### 1.    Background

37.     In Opinion No. 531, the Commission used a composite growth rate, including both short- and long-term growth rates, for the (1+.5g) adjustment the Commission uses for the expected future growth rate of dividends.[78]

38.     In Opinion No. 569, the Commission found that only the short-term growth rate, rather than the two-stage composite growth rate, should be used to calculate the adjustment to the dividend yield. The Commission noted that the appropriate dividend figure to use in the DCF equation is the amount that is expected to be received by the investor during the twelve months following the purchase of the stock. Accordingly, the Commission found that, because the first dividend is necessarily paid within the time period covered by the IBES short-term growth projection, that rate is the more appropriate growth rate for calculating the (1+.5g) adjustment to the dividend yield. The Commission found that the adjusted dividend yield methodology used in Opinion

---

[76] Opinion No. 569, 169 FERC ¶ 61,129 at P 66.

[77] *See* Opinion No. 575, 175 FERC ¶ 61,136 at P 112.

[78] *See* Opinion No. 531-B, 150 FERC ¶ 61,165 at P 6; Opinion No. 531, 147 FERC ¶ 61,234 at PP 15, 17, 39.

No. 546 should be applied to both electric utilities and pipeline companies.[79]  In Opinion No. 569-A, the Commission agreed with this finding.[80]

## 2.     Commission Determination

39.     No party contests the use of the short-term growth rate to calculate the (1+.5g) adjustment to the dividend yields in the DCF model.  Accordingly, we use the short-term growth rate to calculate the (1+.5g) adjustment to the dividend yield, consistent with Opinion No. 569 *et seq.*

## B.     Short-Term Growth Rate

## 1.     Background

40.     In Opinion No. 531, the Commission held that "in future public utility cases, the Commission will adopt the same two-step DCF methodology it used in natural gas and oil pipeline cases."[81]  The Commission further held that "[t]he short-term growth estimate will be based on the five-year projections reported by IBES (or a comparable source)."[82] The Commission similarly noted that "[t]he two-step DCF methodology uses the same IBES short-term growth projections as the one-step DCF methodology."[83]

41.     In disagreeing with arguments regarding using IBES short-term growth projections under the specific facts of the case, the Commission held that "if a proxy company has a growth rate estimate from IBES . . . that growth rate is acceptable for purposes of the Commission's DCF analysis, regardless of the number of analysts on which it was based."[84]  The Commission also was not persuaded by arguments that a certain proxy group company's IBES short-term growth projection should be compared against other growth rate data in the record.  In doing so, the Commission found that "the purpose of not using multiple sources of growth rate data is to ensure that the cost of equity for each company in the proxy group is estimated using the same protocols."[85]  In

---

[79] Opinion No. 569, 169 FERC ¶ 61,129 at PP 98-100.

[80] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 208.

[81] Opinion No. 531, 147 FERC ¶ 61,234 at P 39.

[82] *Id.*

[83] *Id.* P 155.

[84] *Id.* P 72.

[85] *Id.* P 76.

Document Accession #: 20210715-3076          Filed Date: 07/15/2021

*Emera Maine*, the court did not address the issue of using IBES short-term growth projections as the source of the short-term growth rate component of the two-step DCF model.

42.     In Opinion No. 569, the Commission found that the DCF model should employ IBES short-term growth rates.  In the context of the DCF, the Commission explained that IBES was preferable because the IBES growth projections generally represent consensus growth estimates by several analysts while *Value Line* growth estimates represent the growth projection of a single analyst.  The Commission explained that, while many investors use both IBES and *Value Line* growth rates, only IBES growth rates reflect the analysis of a diverse group of persons in the investment community.  The Commission cited academic research that supported the use of IBES because of its use of multiple analysts' growth projections instead of those of a single analyst.  In addition, the Commission noted that IBES growth projections are generally timelier than the *Value Line* projections because IBES updates its database on a daily basis as participating analysts revise their forecasts, whereas *Value Line* publishes its projections on a rolling quarterly basis.[86]  In Opinion No. 569-A, the Commission maintained that IBES short-term growth rates should be used for the DCF model.[87]

### 2.     Briefs

43.     Mystic proposes to use IBES short-term growth rate data from Thomson Reuters.[88] Trial Staff, ENECOS, and Connecticut Parties propose to use IBES data from *Yahoo! Finance*.  Trial Staff and ENECOS provide IBES data downloaded on September 28, 2018, while Connecticut Parties provide data downloaded in July 2018.[89]

44.     ENECOS argues that Mystic's CAPM and DCF analyses use incorrect earnings growth rate data.[90]  ENECOS states that Mystic improperly relied on IBES data from Thomson Reuters rather than *Yahoo! Finance* because the Commission has historically used *Yahoo! Finance* ever since the discontinuation of the IBES Monthly Summary Data Book in 2008.  ENECOS first observes that while *Yahoo! Finance* is accessed free of charge, Thomson Reuters requires a subscription costing $22,000 per year, thereby

---

[86] Opinion No. 569, 169 FERC ¶ 61,129 at PP 120-128.

[87] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 55.

[88] Mystic Initial Brief at 11.

[89] Trial Staff Initial Brief Att. A at 2; Exhibit No. ENC-0404 at 2; Exhibit No. CT-300 at 6.

[90] ENECOS Reply Brief at 13-15.

making it less widely available and less likely to be relied upon by investors.  ENECOS additionally claims that it could not verify Mystic's Thomson Reuters growth rates, which ENECOS states "does not match the IBES data published in *Yahoo! Finance*."[91] ENECOS asserts that different witnesses relying on different data sources for the same earnings growth rates reduces predictability because their respective analyses cannot be compared and encourages the Commission to reaffirm its reliance on *Yahoo! Finance* for its IBES growth rates.[92]

### 3.     Commission Determination

45.     We reject Mystic's use of IBES' short-term growth rate data from Thomson Reuters and affirm the use of IBES' short-term growth rate data as published on *Yahoo! Finance*.

46.     As ENECOS notes, the Commission has consistently used the IBES data published on *Yahoo! Finance*.[93]  Further, IBES data published on *Yahoo! Finance* is more verifiable than other sources because it is publicly available.

47.     In addition, we note that Connecticut Parties' IBES data is from earlier in the study period than that of Trial Staff and ENECOS.  In such cases, the Commission adopts the data from the latest point in time within the study period.[94]  Therefore, we adopt the IBES data provided by Trial Staff and ENECOS.  We note that both parties' data is consistent with each other.

### C.     Long-Term Growth Projection

### 1.     Background

48.     In Opinion No. 531,[95] the Commission modified its policy to require that the DCF analysis used to determine public utility ROEs include a projection of the long-term growth in dividends.  The Commission also reopened the record in order to give participants an opportunity to present evidence concerning the appropriate long-term

---

[91] *Id*. at 15.

[92] *Id.* at 14-15.

[93] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 128.

[94] *Id.* P 101.

[95] Opinion No. 531, 147 FERC ¶ 61,234 at PP 32-40.

growth projection to be used for public utilities under the two-step DCF model.[96]  In response, all participants agreed that estimated long-term growth in GDP is the appropriate growth rate to use as the long-term growth component of the two-step DCF model for public utilities, although New England TOs suggested that a GDP growth estimate underestimates investors' expectations of growth for the public utility industry. In Opinion No. 531-A,[97] the Commission determined that the long-term growth projection should be based on the growth in GDP.  The long-term growth projection was given one-third weight, with a short-term growth projection given two-thirds weight.

49.     The Commission applied the 33% weighting of the long-term growth rate in Opinion No. 569 based on the rationale of Opinion No. 531.[98]  In Opinion No. 569-A, the Commission set aside Opinion No. 569 to give the short-term growth rate 80% weighting and the long-term growth rate 20% weighting.  The Commission explained that, since the Commission established its one-third weighting policy of the long-term growth rate, short-term growth rate projections for electric utilities have declined and are now closer to the current GDP growth projection than those from the 1990s when the Commission adopted the two-step DCF using one-third weighting for the long-term growth rate for natural gas and oil pipelines that was subsequently adopted for public utilities.[99]  The Commission noted that "average electric utility IBES growth projections are only marginally higher than GDP growth projections . . . [and] investors are likely to view electric utility IBES growth projections as more sustainable than the substantially higher natural gas pipeline IBES growth projections when the Commission established its two-thirds/one-third weighting policy.[100]  In light of this, the Commission found that it is appropriate to consider the long-term growth rate to some extent, but that it is appropriate to now afford less influence to the long-term growth rate.[101]  In Opinion No. 569-B, the Commission agreed with the finding in Opinion No. 569-A that it is appropriate to use 20% long-term growth rate weighting and 80% short-term growth rate weighting in the DCF analysis.[102]

---

[96] *Id.* P 43.

[97] Opinion No. 531-A, 149 FERC ¶ 61,032 at P 10.

[98] Opinion No. 569, 169 FERC ¶ 61,129 at PP 151-159.

[99] *See* Opinion No. 569-A, 171 FERC ¶ 61,154 at P 57.

[100] *Id.* PP 57-58.

[101] *Id.* P 59.

[102] *See* Opinion No. 569-B, 173 FERC ¶ 61,159 at P 80.

## 2.    **Briefs**

50.    ENECOS argues that the Commission erred in adopting the revised weighting in Opinion No. 569-A.  ENECOS states that the increased weighting of the short-term growth rate "implies a belief that unsustainable short-term growth rates can continue even further into the future."[103]  Additionally, ENECOS asserts that when short-term growth projections are close to GDP growth projections, the GDP growth rate should be given greater weight.  ENECOS encourages the Commission to "adopt a genuine two-stage DCF analysis in place of its current growth rate weighting approach," contending that "[t]his would enable the Commission to assign a more precise and market-based       (e.g., five-year) time horizon to short-term growth rate forecasts, and an equally more precise and market-based weighting to long-term growth rates."[104]

51.    Similarly, Connecticut Parties argue that the DCF methodology adopted in Opinion No. 569-A should not be applied in this proceeding.  They argue that the continually fluctuating spread between short- and long-term growth rates from 2002 to 2015 to 2018 undermines the basis for Opinion No. 569-A's change and is a good reason for the Commission not to apply the new 4:1 weighting in future cases.[105]

52.    Massachusetts AG also argues that Opinion No. 569-A methodology erred in changing the weighting of the DCF growth rates from two-thirds short term and one-third long term to 80% short-term and 20% long-term.[106]

## 3.    **Commission Determination**

53.    As the Commission stated in Opinion No. 569-A,[107] short-term growth rate projections for electric utilities have declined and are now closer to the current GDP growth projection than those from the 1990s when the Commission adopted the two-step DCF using one-third weighting for GDP in the long-term growth rate for natural gas and oil pipelines that was subsequently adopted for public utilities.  Additionally, the Commission noted that, when IBES growth projections are only marginally higher than GDP projections, investors are likely to view those rates as more sustainable than the

---

[103] ENECOS Initial Brief at 13-14.

[104] *Id.* at 14-16.

[105] Connecticut Parties Initial Brief at 8.

[106] Massachusetts AG Initial Brief at 14-15 (citing Opinion 569-A, 171 FERC ¶ 61,154 at P 57).

[107] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 57-58.

Document Accession #: 20210715-3076          Filed Date: 07/15/2021

substantially higher natural gas pipeline IBES growth projections when the Commission established its two-thirds/one-third weighting policy. We are not persuaded by the arguments presented by ENECOS, Connecticut Parties, and Massachusetts AG that the revised weighting adopted in Opinion No. 569-A is inappropriate in this proceeding. Accordingly, we find it reasonable to give the IBES short-term growth projection 80% and the long-term growth rate 20%. Additionally, we conclude that this approach is a reasonable exercise of the broad discretion that courts afford the Commission in its weighting choice.

54.     Furthermore, we find that ENECOS's argument that the Commission erred in Opinion No. 569-A by revising the long-term growth rate weighting to be a collateral attack on Opinion No. 569-A. Although parties may argue why a different weighting is more appropriate given the facts and circumstances in a particular proceeding, ENECOS's argument does not demonstrate why such a revised weighting is more appropriate here.

## V.     **CAPM**

### A.     **Expected Market Return**

#### 1.     **Background**

55.     In Opinion No. 569, the Commission accepted Trial Staff's proposal to screen from the CAPM analysis S&P 500 companies with growth rates that are less than or equal to zero or greater than or equal to 20%. The Commission stated that such a screen is consistent with the elimination of outliers elsewhere in the ROE methodology, as such high or low growth rates are highly unsustainable and non-representative of the growth rates of the electric utilities in the proxy groups.[108] In Opinion No. 569-A, the Commission continued to find that it was appropriate to screen companies with growth rates that are less than or equal to zero or greater than or equal to 20%. The Commission found that zero or negative and very high growth rates are both unsustainable and should thus be excluded from the determination of the CAPM risk premium, even if they enhance the diversity of covered companies.[109]

56.     In Opinion Nos. 569 and 569-A, the Commission found that estimating the CAPM expected market return using a forward-looking approach, based on applying the DCF model to the dividend-paying members of the S&P 500, is reasonable.[110] In Opinion

---

[108] Opinion No. 569, 169 FERC ¶ 61,129 at P 267.

[109] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 77.

[110] *Id.* P 85; Opinion No. 569, 169 FERC ¶ 61,129 at P 260.

No. 569, the Commission adopted a forward-looking approach based upon a one-step
DCF analysis of the dividend-paying members of the S&P 500 for the expected market
return. Specifically, the Commission found that only the IBES short-term growth
projection should be used in the one-step DCF analysis of the dividend-paying members
of the S&P 500, which is consistent with the Presiding Judge's approach in Initial
Decision (II, III).[111]  The Commission rejected proposals to use a two-step DCF analysis
for estimating the CAPM expected market return and found that the rationale for
incorporating a long-term growth rate estimate in conducting a two-step DCF analysis of
a specific utility or group of utilities for purposes of directly estimating the cost of equity
does not apply to the DCF analysis of a broad representative market index with a wide
variety of companies that is regularly updated to include new companies for purposes of
determining the required return to the overall market.[112]  Further, the Commission found
that because the dividend-paying members of the S&P 500 constitute a large portfolio of
stocks, they include companies at all stages of growth.[113]

57.       In Opinion No. 569, the Commission, citing precedent, required use of IBES
short-term growth rate data, without drawing a distinction between its use in DCF or
CAPM analyses.[114]  In Opinion No. 569-A, the Commission concluded that IBES is a
reliable source of short-term growth rate data and thus found it reasonable for IBES
growth rates to be used in the CAPM model.  However, the Commission clarified that it
would consider the use of *Value Line* short-term growth rates for the CAPM model in
future proceedings.  The Commission explained that *Value Line* is regularly updated,
investors use it, and the Commission seeks to diversify its data sources.[115]  Nonetheless,
the Commission found that the record in the those proceedings was insufficient to adopt
use of *Value Line* growth rates at that time, noting there was no CAPM analysis in the
record that applied the growth rate screen to *Value Line* short-term growth rates.[116]  In
Opinion No. 569-B, the Commission continued to find that it is appropriate to consider

---

[111] Opinion No. 569, 169 FERC ¶ 61,129 at P 555 (citing *Ark. Elec. Coop. Corp. v.
ALLETE, Inc.*, 155 FERC ¶ 63,030, at P 412 (2016)).

[112] *Id.* P 266; Opinion No. 569-A, 171 FERC ¶ 61,154 at P 85.

[113] Opinion No. 569, 169 FERC ¶ 61,129 at PP 85, 265.

[114] *See id.* PP 101-104.

[115] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 78.

[116] *Id.* P 83.

Document Accession #: 20210715-3076          Filed Date: 07/15/2021

the use of *Value Line* short-term growth rates for the CAPM model in future proceedings.[117]

## 2.  **Briefs**

58.     Mystic states that Dr. Vilbert and Mr. Sheilendranath use *Value Line* growth rate estimates in the expected market return calculation because the Commission found in Opinion No. 569-A that it will consider *Value Line* growth rate estimates to diversify data sources.  Dr. Vilbert and Mr. Sheilendranath agree with the Commission's reasoning in Opinion No. 569-A that *Value Line* growth rates incorporate the input of multiple analysts, are updated on a more predictable basis, and are used by numerous investors.  Dr. Vilbert and Mr. Sheilendranath also agree that diversifying data sources may better reflect the sources that investors consider.[118]  Mystic presents an alternate risk premium that does not screen S&P 500 companies with growth rates outside the zero to 20% range.  Mystic states that this screen is duplicative because "the calculation . . . already excludes some of the fastest growing companies in the S&P 500 because they don't pay dividends" and argues that "[i]gnoring these companies leads to a lower estimate of the expected market return."[119]  Mystic asserts that this screen does not consider share buybacks, thereby exacerbating the downward bias of the expected market return.  Additionally, Mystic contends that because the S&P 500 is not static, "the weighted average of the individual growth projections is representative of investors' expectations for the current, broader market return."[120]

59.     ENECOS presents multiple expected market returns using both IBES and *Value Line* growth rates.  ENECOS states that Dr. Lesser performed three risk premium analyses to calculate an appropriate CAPM analysis:  first, Dr. Lesser used "a market risk premium that was based on a true two stage DCF analysis;" second, Dr. Lesser used "*Value Line* growth rate forecasts and a true two-stage DCF analysis of the S&P 500 firms;" third, Dr. Lesser used "a single-stage, constant growth DCF analysis of the S&P 500 Index firms to determine the market risk premium."[121]  ENECOS states that "Dr. Lesser then used IBES growth rate forecasts to perform the single-stage, constant growth DCF analysis required to be used by Opinion No. 569 to calculate the market risk

---

[117] Opinion No. 569-B, 173 FERC ¶ 61,159 at PP 90-91.

[118] Mystic Initial Brief at 8-9.

[119] *Id.* at 9.

[120] *Id.* at 9.

[121] ENECOS Initial Brief at 19-21.

Document Accession #: 20210715-3076     Filed Date: 07/15/2021

component of the CAPM analysis" and avers that the calculated expected market return is 13.15% using IBES growth rates, yielding a risk premium of 10.07%.[122]

60.  ENECOS states that Dr. Lesser compared these results to historical market premiums over 43 separate 50-year periods, ranging from 1926-1975 to 1968-2017.[123] ENECOS states that the smallest observed and largest observed average risk premiums observed over any historical 50-year period is 3.83% and 8.56%, respectively.  ENECOS states that the standard deviation of this dataset was 1.47% and that a 10.07% risk premium is 2.37 standard deviations from the calculated mean and therefore would be rejected as outside of a 99% confidence interval.  ENECOS argues that, in contrast, its CAPM analysis using *Value Line* growth rates to calculate an expected risk premium of 8.43% is 1.25 standard deviations above the calculated mean and would be expected to occur about once every 10 years.

61.  ENECOS argues that this provides compelling support to use a two-stage DCF analysis rather than the single-stage constant growth DCF contemplated by the Commission in Opinion Nos. 569 and 569-A.[124]  ENECOS argues that use of a single-stage constant growth DCF to calculate the risk premium substantially overestimates the cost of equity.[125]  ENECOS adds that the Commission's argument in Opinion No. 569 that the changing makeup of the S&P 500 over time makes this approach acceptable is misdirected because, ENECOS asserts, "[t]he CAPM's market risk premium input is the market risk premium for the entire market" and that, while the S&P 500 may be a *proxy* for the entire market, it is unreasonable and inconsistent with financial theory to assume its earnings growth rate equals that of the entire market.[126]  To support this assertion, ENECOS observes that a firm does not vanish from the market simply because it is no longer included in the S&P 500.  ENECOS states that the Commission should apply a two-stage DCF model to estimate risk premium in order to adequately recognize that the long-term return in the market as a whole cannot exceed the overall growth rate in the economy.[127]

---

[122] *Id.* at 21.

[123] *Id.* at 21-22.

[124] *Id.* at 23.

[125] *Id.* at 23-25.

[126] *Id*. at 25.

[127] *Id.* at 25-26.

Document Accession #: 20210715-3076    Filed Date: 07/15/2021

62.     As discussed above, ENECOS argues that Mystic's CAPM analysis uses incorrect earnings growth rate data from Thomson Reuters.[128]  Additionally, ENECOS claims that Mystic's CAPM analyses fail to follow the methodology set forth in Opinion No. 569-A in numerous ways.[129]  ENECOS claims that for the first proposed CAPM analysis, Mystic's witnesses inexplicably and inappropriately used *Value Line* forecast earnings growth rates starting in 2016, rather than the study period year of 2018.  ENECOS additionally claims that Mystic did not use the DCF methodology to calculate the CAPM's expected market risk premium input for the first model.  ENECOS states that Mystic's witnesses instead calculated a weighted average growth rate for all firms in the S&P 500 and then added that to a weighted average dividend yields for all dividend-paying firms.[130]  ENECOS adds that "[e]ven in the instance where Mystic's witnesses applied Opinion No. 569's instructions and excluded S&P 500 companies with growth rates above 20% and/or did not pay dividends from the expected market return premium input, the resulting 9.83% value was rejected at the standard 95% confidence level."[131]

63.     ENECOS argues that the other three estimates are even higher and less plausible and notes that one estimate produces a risk premium of 13.77%.[132]  ENECOS argues that Mystic's witnesses, to achieve this result, included all S&P 500 firms, including those that do not pay dividends and/or have EPS growth rates above 20%.  ENECOS states that as an initial matter, it is not possible to include companies that do not pay dividends in a DCF analysis.  ENECOS additionally argues that including companies with a growth rate exceeding 20% defies economic logic and Opinion No. 569's instruction.  ENECOS states that including such companies would inherently assume that S&P 500 companies would far exceed growth in U.S. GDP and eventually total GDP.  ENECOS argues that a two-stage DCF analysis would address this issue and would helpfully address Mystic's witnesses' concerns about share buybacks, as well.[133]

64.     Connecticut Parties witness Mr. David C. Parcell uses *Value* Line growth rate estimates in his CAPM analysis.  Connecticut Parties state that the changes to the CAPM methodology adopted in Opinion No. 569-A should not be applied in this proceeding.

---

[128] ENECOS Reply Brief at 13-15.

[129] *Id.* at 16-20.

[130] *Id.* at 17.

[131] *Id.* at 18.

[132] *Id.* at 18-19.

[133] *Id.* at 20.

Connecticut Parties argue that a one-step DCF of S&P 500 companies produces a risk premium that is excessive in this case. Connecticut Parties argue that the one-step DCF study has received neither support in academic literature nor by financial analysts and that this approach has a logical flaw of treating three to five year-growth estimates as remaining constant in perpetuity. Connecticut Parties further argue that the risk premium calculation is further discredited by use of companies listed in the S&P 500 instead of the S&P 500 itself. Connecticut Parties argue that the record demonstrates an unrealistic basis point divergence between the estimation of the expected return and the actual, realized return. Connecticut Parties argue that this divergence undermines any suggestion that Opinion No. 569-A CAPM methodology should be applied in this case.[134] Mystic states that Mr. Parcell uses *Value Line* growth rate data that is as of August 2018 rather than September 2018, the end of the study.[135]

65.      Massachusetts AG argues that in Order No. 569-A, the Commission largely adopted New England TOs' CAPM, which Massachusetts AG argues includes, among other defects, a flawed risk premium which relies on a single stage DCF calculation of the S&P 500 index to estimate a growth rate in future earnings. Massachusetts AG argues this approach lacks any long-term growth rate data and therefore unrealistically assumes that the subject proxy companies can grow at their short-term growth rates indefinitely.[136] Massachusetts AG argues this flaw puts upwards pressure on the results of the CAPM, rendering the methodology incapable of reliably identifying a just and reasonable ROE under the standards of *Hope* and *Bluefield*.[137] Massachusetts AG argues the record clearly illustrates that the CAPM must be modified to use a realistic market risk premium, such as one that recognizes long-term GDP.[138] Massachusetts AG argues Opinion No. 569-A's statement about how often the S&P 500 is updated misunderstands the role that index plays in the CAPM analysis. Massachusetts AG argues that as such, the CAPM must be modified to include a long-term component in order to be viable.[139]

---

[134] Connecticut Parties Initial Brief at 11.

[135] Mystic Reply Brief at 13.

[136] Massachusetts AG Initial Brief at 8-9.

[137] *Id.* at 9.

[138] *Id.*

[139] *Id.* at 10.

66.     Trial Staff uses IBES growth rate estimates in the expected market return calculation.[140]   Trial Staff notes that its earlier CAPM position in the first paper hearing applied the two-step DCF result to the CAPM with no size adjustments.[141]   Trial Staff's current proposal has been updated to reflect a corrected analysis period, the addition of Edison International to the CAPM proxy group, and the application of the one-step DCF result and size adjustments to the CAPM.[142]

### 3.     Commission Determination

67.     Consistent with Opinion No. 569 *et seq.*, we find that estimating the CAPM expected market return using a forward-looking approach based on applying the DCF model to the dividend-paying members of the S&P 500 is reasonable.[143]   We are not persuaded by arguments made by ENECOS, Connecticut Parties, and Massachusetts AG that the use of a one-step DCF model to estimate the expected market return is inappropriate or inconsistent with the Commission's use of a composite growth rate in the DCF model.  The Commission addressed this issue in Opinion No. 569, and we reiterate that reasoning here.  The rationale for incorporating a long-term growth rate estimate in conducting a two-step DCF analysis of a specific group of utilities does not apply when conducting a DCF study of the companies in the S&P 500.[144]   The Commission's rationale for incorporating a long-term growth rate estimate in DCF analyses for public utilities is that it is often unrealistic and unsustainable for high short-term growth rates to continue in perpetuity for a particular utility or group of utilities.[145]

68.     The purpose of the DCF analysis in the CAPM is to determine the "required return on the overall market" that will be used to determine the market risk premium.[146]   In Opinion No. 569, the Commission stated that, while it may be unreasonable to expect an individual company to sustain high short-term growth rates in perpetuity, the same cannot

---

[140] Trial Staff Initial Brief Attach. C at 3-13.

[141] *Id.* at 25 (citing Fishbein Aff. at PP 38-45).

[142] *Id.* at 25-28.

[143] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 85; Opinion No. 569, 169 FERC ¶ 61,129 at P 260.

[144] Opinion No. 531-B, 150 FERC ¶ 61,165 at P 113.

[145] *See* Opinion No. 531, 147 FERC ¶ 61,234 at P 36 n.63.

[146] *See* Opinion No. 531-B, 150 FERC ¶ 61,165 at P 113.

be said for a broad representative market index that is regularly updated to include new companies (i.e., a portfolio of companies behaves differently than an individual company).[147]  Therefore, we exclude from consideration any two-step expected market return analyses.

69.    Similarly, we reject Mystic's proposal not to remove from the expected market return calculation S&P 500 companies whose growth rates are below zero or above 20%. The Commission addressed similar arguments in Opinion No. 569 *et seq.*, finding that evidence indicates that the use of this growth rate screen is appropriate in the CAPM analysis and stated that such high or low growth rates are highly unsustainable and non-representative of the growth rates of the electric utilities in the proxy groups.  The Commission pointed to examples in the evidence applying similar screens and/or indicating that growth rates excluded by such screens are unsustainable.[148]  We reiterate the Commission's reasoning in Opinion Nos. 569 and 569-A and find that this screen proposed by Trial Staff is appropriate because it will exclude companies with unsustainable growth rates.  Accordingly, we find that S&P 500 companies with growth rates that are less than or equal to zero and greater than or equal to 20% should be excluded from the CAPM analysis in this proceeding.

70.    As discussed above, the Commission stated in Opinion No. 569-A that it would consider the use of *Value Line* growth rates in the expected market return calculation.  In that proceeding, the record did not contain sufficient evidence to use *Value Line* growth rates, and accordingly, the Commission adopted an expected market return based on IBES growth rates.[149]  However, here the record contains sufficient data to calculate the expected market return with either IBES or *Value Line* growth rates but contains no compelling evidence that the facts and circumstances of this proceeding favor use of *Value Line* growth rates.  In this circumstance, we find that it is more appropriate to adopt an expected market return based on IBES growth rates.  Using IBES growth rates promotes consistency between the DCF and CAPM models.  The record does not demonstrate that the costs of sacrificing this consistency would be outweighed by the diversity of data sources and other benefits of *Value Line* growth rates.  Furthermore, using IBES growth rates has the advantage of representing input from multiple analysts, unlike that of a single analyst for *Value Line*.

71.    Mystic, ENECOS, and Trial Staff provide expected market premiums that correctly apply a one-step DCF calculation using IBES growth rates.  However, we agree with ENECOS that Mystic incorrectly sources its IBES data from Thomson Reuters

---

[147] Opinion No. 569, 169 FERC ¶ 61,129 at P 266.

[148] *Id.* PP 267-268.

[149] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 81-83.

Document Accession #: 20210715-3076          Filed Date: 07/15/2021

rather than *Yahoo! Finance*. As discussed above, the Commission has consistently used the IBES data published on *Yahoo! Finance* rather than other sources. Mystic has provided no evidence that the IBES growth rates from Thomson Reuters are more accurate, up-to-date, or otherwise preferable to those from *Yahoo! Finance.* Use of the latter is consistent with Commission precedent and is freely available and thus does not impose costs on ROE proceeding participants. Therefore, we exclude Mystic's expected market return from consideration. Neither ENECOS nor Trial Staff include timestamps with their expected market return calculations or other record evidence to determine which party's data was downloaded later in the study period. However, ENECOS includes all S&P 500 companies and then applies the dividend and growth rate screens in its analysis, whereas Trial Staff only shows the companies that cleared those two screens in its analysis. Because ENECOS's analysis can be more readily verified, we adopt ENECOS's expected market return of 13.15%.

### B.    Betas and Size Premiums

#### 1.    Background

72.    In Opinion No. 569, the Commission affirmed the approach in Opinion No. 531-B that the size premium adjustment to the base CAPM ROE range is "a generally accepted approach to CAPM analyses."[150]  The Commission stated that substantial evidence in the record supported the conclusion that investors rely on *Value Line* betas. While the Commission acknowledged that there is an imperfect correspondence between the size premiums being developed with different betas, it concluded that the size adjustments improve the accuracy of the CAPM results and cause it to better correspond to the costs of capital estimates employed by investors.[151]

73.    The Commission also found that the application of size adjustments based on the New York Stock Exchange (NYSE) to dividend-paying members of the S&P 500 is acceptable, as the use of the NYSE for the size premium adjustment enabled Ibbotson Associates to develop a rich data set,[152] and found no evidence that companies in the S&P 500 feature different risk premiums than those in the NYSE.[153]

---

[150] Opinion No. 569, 169 FERC ¶ 61,129 at P 296 (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 117).

[151] *Id.* P 297.

[152] Ibbotson Associates, now under Duff & Phelps, has long published a series quantifying this effect for various sizes of firms, pulling from data going back to 1926.

[153] Opinion No. 569, 169 FERC ¶ 61,129 at P 298.

Document Accession #: 20210715-3076     Filed Date: 07/15/2021

74.     The Commission disagreed with intervenors that the utility industry is unique, and that the size premium adjustment would therefore be inapplicable, as the size premium adjustments are supported by a robust data set.  The Commission noted that there are variations in the risk profiles of firms of any industry and there was insufficient evidence in the record to conclude that factors specific to the utility industry insulate smaller utilities from risks such that the CAPM betas sufficiently account for any increased risks and corresponding returns demanded by investors.[154]

75.     In Opinion No. 569-A, the Commission continued to find that the size adjustment is necessary to correct for the CAPM's inability to fully account for the impact of firm size when determining the cost of equity.  The Commission reiterated its finding in Opinion No. 569 that there is substantial evidence indicating that investors rely on *Value Line* betas in making investment decisions.[155]  Furthermore, the Commission explained that it was not persuaded by arguments that betas calculated based on the NYSE cannot be used with the S&P 500.  The Commission upheld its finding that size adjustments are appropriate for the utility industry and that they improve the overall accuracy of the CAPM results.[156]

76.     In Opinion No. 569-A, the Commission acknowledged the imperfect correspondence of applying *Value Line* betas derived from the NYSE to risk premiums developed using the S&P 500.  However, the Commission found that it is not reasonable to calculate the risk premium using the full 2800 companies in the NYSE.[157]

## 2.     **Briefs**

77.     Trial Staff witness Dr. Alexander J. Gill suggests a possible remedy to a problem noted by the Commission in Opinion No. 569-A concerning an imperfect correspondence of applying *Value Line* betas derived from the NYSE to risk premiums developed using the S&P 500.[158]  To create an alternative, Dr. Gill retrieved betas for the CAPM proxy group from Bloomberg L.P. (Bloomberg) based on weekly data from the S&P 500 Index

---

[154] *Id.* P 303.

[155] *See id.* P 297.

[156] *Id.* PP 297-298, 301, 303; Opinion No. 569-A, 171 FERC ¶ 61,154 at P 75.

[157] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 75.

[158] Trial Staff Initial Brief 28 (citing Opinion No. 569-A, 171 FERC ¶ 61,154 at P 76).

Document Accession #: 20210715-3076        Filed Date: 07/15/2021

for the five years ending September 30, 2018.  Dr. Gill provides the results in response to the Commission's recognition of this mismatch for illustrative purposes.[159]

78.  Mystic provides size premium data from the Duff & Phelps CRSP Deciles Size Premia as of December 31, 2017 while Trial Staff provides the CRSP Deciles table from the 2018 study.[160]  ENECOS provides the full table of size premium data from the Duff & Phelps Cost of Capital Navigator as of October 1, 2018 and Connecticut Parties provide size premium data extracted from the Cost of Capital Navigator as of December 31, 2018 as part of their CAPM analysis.[161]

79.  Connecticut Parties argue the application of a size premium in the CAPM is inappropriate in this case.  Connecticut Parties argue that there is record evidence[162] demonstrating that there is no discernible pattern of increase among the risk indicators of publicly traded electric utilities of different sizes.  Specifically, Connecticut Parties assert that the safety ranks, beta values, financial strength, and bond ratings of electric utilities do not systematically vary by market capitalization.  Connecticut Parties argue that due to the record evidence, there is no basis to apply a size premium adjustment to the CAPM for Mystic.[163]

80.  Mystic states that Connecticut Parties witness Mr. Parcell uses size premium data as of December 31, 2018, past the September 2018 end of the study period.[164]

### 3.    Commission Determination

81.  Consistent with Opinion Nos. 569 and 569-A, we find that the size adjustment is necessary to correct for the CAPM's inability to fully account for the impact of firm size when determining the cost of equity.[165]  Despite assertions that the academic literature

---

[159] *Id.* at 28-29.

[160] Mystic Reply Brief Attach. C at 11.  Trial Staff Initial Brief Attach. C at 74.

[161] ENECOS Initial Brief, *Size Premiums* worksheet.  Exhibit No. CT-305.

[162] *See* Exhibit No. CT-201.

[163] Connecticut Parties Initial Brief at 13.

[164] Mystic Reply Brief at 13.

[165] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 297.

supporting size adjustments is inconclusive, we find sufficient support for their use in the CAPM. Specifically, Dr. Roger A. Morin supports the "size effect," finding that:

> Investment risk increases as company size diminishes, all else remaining constant. Small companies have very different returns than large ones, and on average they have been higher. The greater risk of small stocks does not fully account for their higher returns over many historical periods.[166]

82.     Dr. Morin also avers that the higher returns required by investors in small companies than the CAPM would project is well documented in the financial literature.[167] Specifically, Dr. Morin cites to work by Rolf Banz showing that, from 1936 to 1975, stocks of small firms earned higher risk-adjusted abnormal returns than those of large firms.[168] Venkat Eleswarapu and Marc Reinganum found a similar dynamic, looking at the relationship between firm size and price-earnings ratio.[169] Duff & Phelps has long published a series quantifying this effect for various sizes of firms, using data going back to 1926.

83.     We also find there to be insufficient reason to conclude that the utility industry is unique in such a way as to render the size adjustment inapplicable, as Connecticut Parties suggest. The size premium adjustment is supported by a robust data set. Although the variations in the risk profiles of firms in any industry inevitably vary to some degree, we do not see sufficient evidence in the record to conclude that factors specific to the utility industry insulate smaller utilities from risks such that the CAPM betas sufficiently account for any increased risks and corresponding returns demanded by investors.

84.     We agree with Mystic that Connecticut Parties incorrectly present size premium data from outside of the study period. However, we also note that Mystic's size premiums are based on data from December 2017 and ENECOS's size premiums are based on data from October 2018.[170] Trial Staff, however, correctly presents size

---

[166] Roger A. Morin, *New Regulatory Finance* (Public Utilities Reports, Inc. 2006) at 181 (Morin).

[167] *Id.* at 181-183.

[168] *Id.* (citing Rolf W. Banz, *The Relationship Between Return and Market Value of Common Stocks*, 9 J. Fin. Econ. 3 (1981)).

[169] Marc R. Reinganum, *Misspecification of Capital Asset Pricing Empirical Anomalies Based on Earnings Yields and Market Values*, 9 J. Fin. Econ. 19 (1981).

[170] Mystic Reply Brief Attach. C at 11; ENECOS Initial Brief, *Size Premiums* worksheet.

premiums from the 2018 Duff & Phelps CRSP Deciles Study.[171]  Therefore, we adopt the size premiums presented by Trial Staff.

85.     Dr. Gill's proposed use of Bloomberg-based alternative betas derived from the returns to the S&P 500 Index provides a reasonable method of addressing the imperfect correspondence between the S&P 500 and NYSE discussed in Opinion No. 569-A. Therefore, we find that the alternative betas presented by Dr. Gill are more appropriate for the facts and circumstances of this proceeding than *Value Line* betas and adopt Dr. Gill's betas for this proceeding.

## VI.   <u>Risk Premium</u>

### A.     <u>Background</u>

86.     In Opinion No. 569-A, the Commission reversed its decision in Opinion No. 569 on use of the Risk Premium model and found that, with the modifications made by the Commission,[172] the defects of the Risk Premium model do not outweigh the benefits of model diversity and reduced volatility resulting from the averaging of more models.[173] The Commission found that the Risk Premium model is sufficiently distinct from the CAPM to use in its ROE analysis, noting that the Risk Premium relies on corporate utility bonds while the CAPM uses Treasury Bond yields.[174]  The Commission further found that, while the Risk Premium model contains some circularity, the averaging of the results with those of the DCF and CAPM models sufficiently mitigates that circularity.[175] In Opinion No. 569-B, the Commission continued to find that the Risk Premium model should be used in its analysis of ROEs pursuant to FPA section 206.[176]

---

[171] Trial Staff Initial Brief Attach. C at 74.

[172] The Commission adjusted which ROE proceedings the model includes, aligned the timing of bond yields to ROEs, and used individual cases rather than annual averages to address certain implementation suboptimalities that it had cited in Opinion No. 569.

[173] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 104.

[174] *Id.* P 105.

[175] *Id.* P 106.

[176] Opinion No. 569-B, 173 FERC ¶ 61,159 at PP 113-122.

## B.    **Briefs**

87.    Mystic states that Dr. Vilbert and Mr. Sheilendranath performed the Risk Premium method consistent with Opinion No. 569-A and produced an estimate of 9.94%.  Mystic also provides an imputed range for the Risk Premium based on the average of the ranges of the DCF and CAPM models.[177]  Trial Staff supports Dr. Gill's Risk Premium ROE estimate of 9.83%.[178]  Trial Staff explains that Dr. Gill applied the Risk Premium model as refined by Opinion No. 569-A.[179]  Trial Staff explains that for the six-month period in this case, Dr. Gill followed the Commission's directive in the Order Directing Briefs to the most recent six-month study period before the conclusion of the first hearing in this proceeding.[180]  However, Trial Staff expresses concern with the Risk Premium model as applied in the parties' initial filings in this case.  First, Trial Staff argues that Mystic has duplicated several observations,[181] included dockets that were appropriately excluded by the Commission,[182] and excluded others that should be included.[183]

88.    Connecticut Parties witness Mr. Parcell provides two Risk Premium estimates, one based on the method used in Opinion No. 569-A and another excluding ROEs contained in settlements.  Connecticut Parties argue that the Risk Premium method adopted in Opinion No. 569-A should not be applied here because there is a high likelihood that ROEs set by settlement reflect factors other than the market cost of equity and therefore settlement ROEs should not be included in the risk premium study.  However, Connecticut Parties state that applying the method used in Opinion No. 569-A results in a Risk Premium estimate of 9.93%.[184]

89.    ENECOS argues that the Risk Premium analysis applied in Opinion No. 569-A is not market-based and that it contravenes the requirements of *Hope* and *Bluefield* because

---

[177] Mystic Initial Brief at 12-13.

[178] Trial Staff Initial Brief at 30.

[179] *Id.* at 30-34; Trial Staff Reply Brief at 43.

[180] Trial Staff Reply Brief at 39 (citing *Constellation Mystic Power, LLC*, 172 FERC ¶ 61,093 at P 16 (citing December 2018 Order, 165 FERC ¶ 61,267 at P 34)).

[181] *Id.* at 39-41.

[182] *Id.* at 41.

[183] *Id.* at 41-42.

[184] Connecticut Parties Initial Brief at 13-14.

a just and reasonable ROE must reflect contemporaneous capital market conditions.[185] ENECOS states that the Commission relying on past Commission ROE decisions "suffers from circularity" and that because these inputs are historical data points, the analysis cannot be used. ENECOS argues that the Commission's rationale that "all models contain some circularity" is an insufficient explanation to use circular models in the first place.[186] ENECOS asserts that averaging the Risk Premium model result with the CAPM and DCF results neither mitigates nor resolves this shortcoming. Finally, ENECOS argues that imputing a range to the Risk Premium model result is statistically invalid and that such an approach is unsupported.[187]

90.     Additionally, ENECOS argues that several of Mystic's proposed "corrections" to the Commission's Risk Premium analysis are incorrect.[188] ENECOS claims the following are errors made in Mystic's Risk Premium analysis: (a) Docket No. ER07-549 – the Commission did not rule on justness and reasonableness of base allowed ROE and should be excluded; (b) Docket No. ER08-1548 – this is a case on improving return incentives, not base allowed ROE, and therefore should be excluded; (c) Docket No. ER09-14 – this is a case on improving return incentives, not base allowed ROE, and therefore should be excluded; (d) Docket No. ER09-187 – the allowed ROE is not 10.53%, as Dr. Vilbert and Mr. Sheilendranath claim; instead, the Commission updated the calculation to adjust the ROE due to changes in bond yields, and the ROE was adjusted downwards from 10.53% to 10.04%.[189]

91.     Massachusetts AG argues that the Risk Premium method suffers from such significant flaws that the Commission criticized its reliability before casting it aside entirely while acknowledging its use would "likely undermine transparency and predictability of Commission outcomes."[190] Massachusetts AG contends the Commission correctly held in Opinion No. 569 that the Risk Premium method in its

---

[185] ENECOS Initial Brief at 16-17.

[186] *Id.* at 18 (citing Opinion No. 569-A, 171 FERC ¶ 61,154 at P 106; *Id.* (Glick, Comm'r, dissenting in part, at P 14)).

[187] *Id.* at 19 (Opinion No. 569-A, 171 FERC ¶ 61,154 (Glick, Comm'r, dissenting in part, at P 17)).

[188] ENECOS Reply Brief at 27-28.

[189] *Id.* at 27-28 (citing Opinion No. 569-A, 171 FERC ¶ 61,154 at P 110; *Southern California Edison Co.*, 139 FERC ¶ 61,042, at P 41 (2008)).

[190] Massachusetts AG Initial Brief at 10 (citing Opinion No. 569, 169 FERC ¶ 61,129 at P 340).

Document Accession #: 20210715-3076          Filed Date: 07/15/2021

current iteration is unreliable and should not be considered in this proceeding.[191] Massachusetts AG states the Risk Premium method at issue was first proposed by the New England TOs in the New England ROE complaint cases, but that numerous parties across multiple cases have illustrated that this approach is flawed and fails to accurately reflect the market cost of equity.[192]

92.     Massachusetts AG asserts these flaws are apparent in several cases.  For example, Massachusetts AG argues that, in Opinion No. 531-B, the Commission acknowledged the "inherent weakness" in the New England TOs' Risk Premium method, finding it "sufficiently reliable—not to set the ROE itself" but only to "corroborate our decision to place the [New England TOs'] base ROE above the midpoint."[193]  Similarly, Massachusetts AG avers that in Opinion No. 551, the Commission recognized the same Risk Premium method remained insufficiently reliable to actually set the ROE.[194] Further, Massachusetts AG argues that in Opinion No. 569, the Commission realized the Risk Premium approach did not belong in its ROE method.[195]

93.     Massachusetts AG contends that Opinion No. 569-A fails to address the fundamental flaws that parties and Opinion No. 569 recognized—the Risk Premium method as adopted does not reflect the *current* market cost of equity capital. Massachusetts AG asserts the Opinion No. 569-A Risk Premium method continues to rely on *past* ROE data, including the use of settlement data from cases with neither ROE testimony nor calculations, and the same regression analysis[196] that the Commission previously criticized because it "creates a dynamic where, regardless of the capital market conditions, the Risk Premium analysis will keep the ROE essentially stable."[197]

94.     Massachusetts AG states that the Risk Premium method at issue in this proceeding compares Commission-authorized ROE decisions to the level of triple-B bond yields for the six months preceding the date of the determination.  Massachusetts AG avers this approach is fatally circular because it relies on risk premiums implied by past

---

[191] *Id.* at 10.

[192] *Id.* at 11.

[193] *Id.* (citing Opinion No. 531-B, 150 FERC ¶ 61,165 at P 98).

[194] *Id.* at 11 (citing Opinion No. 551, 156 FERC ¶ 61,234 at P 195).

[195] *Id.* at 12-13 (citing Opinion No. 569, 169 FERC ¶ 61,129 at PP 340-345, 350).

[196] *Id.* at 13 (citing Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 108-109).

[197] *Id.* (citing Opinion No. 569, 169 FERC ¶ 61,129 at P 344).

Document Accession #: 20210715-3076        Filed Date: 07/15/2021

Commission determinations, including settlements. Massachusetts AG concludes that Opinion No. 569 correctly and compellingly rejected the use of the Risk Premium method, a decision the Massachusetts AG continues to support.[198]

95.    Massachusetts AG argues that if the Commission decides to apply the Risk Premium method in this proceeding, the Commission should revise Opinion No. 569-A and exclude settlements. Massachusetts AG contends that, as the Connecticut Parties illustrate, settled ROEs come out higher than litigated ROEs, likely because parties are willing to accept a higher ROE in exchange for other concessions. Massachusetts AG states that Mr. Parcell conducted a Risk Premium analysis excluding these settled results, which produced a result of 8.63%. Massachusetts AG argues that if the Commission decides to include the Risk Premium method in this proceeding, Massachusetts AG requests that the Commission adopt Mr. Parcell's preferred application. Massachusetts AG asserts that should the Commission strictly apply the Opinion No. 569-A methodology, Mr. Parcell's application identifies a Risk Premium of 9.93%.[199]

## C.    Commission Determination

96.    In Opinion Nos. 569-A and 569-B, the Commission found that the Risk Premium model has an adequate theoretical basis and is sufficiently distinct from the CAPM to use in ROE analysis.[200] We have not been persuaded otherwise here and we continue to include the Risk Premium model in the Commission's ROE analysis.

97.    Regarding circularity of the Risk Premium model, consistent with our finding in Opinion No. 569-A, we find that such circularity is not substantial enough to be fatal.[201] Although the Risk Premium model entails some circularity, the averaging of the results with those of the DCF and CAPM models sufficiently mitigates that circularity. Additionally, all of the models contain some circularity. Consequently, we believe that the level of circularity in the Risk Premium model is acceptable.

98.    Regarding the use of settlements as a deficiency of the Risk Premium model, we continue to recognize that parties may consider many factors when settling rate case proceedings. However, because of how directly ROEs affect rates, we conclude that parties engaged in arms-length negotiations consider the ROE in the course of reaching

---

[198] Massachusetts AG Reply Brief at 15.

[199] *Id.* at 16.

[200] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 104-107; Opinion No. 569-B, 173 FERC ¶ 61,159 at PP 113-114.

[201] Opinion No. 569-A, 171 FERC ¶ 61,154 at P 106.

settlements, even if the records in certain proceedings do not contain specific ROE calculations or testimony.  Consequently, we continue to find that the ROEs from such settlements are reasonable to include in the Risk Premium analysis.  In Opinion No. 569-A, the Commission identified certain cases that should be excluded from the Risk Premium analysis,[202] and we continue to find that this is appropriate.  Appendix D to this order shows the results of the Risk Premium analysis in this proceeding, as applied in accordance with these findings.

99.     We agree with ENECOS that Docket Nos. ER07-549, ER08-1548, and ER09-14 are properly excluded from consideration for the Risk Premium for the reasons given by ENECOS.  As shown in Appendix D, we have excluded these proceedings from the Risk Premium model.  Similarly, we agree with ENECOS that the appropriate base ROE for Docket No. ER09-187 is 10.04% for the reason given by ENECOS, as shown in Appendix D.

## VII.    **Expected Earnings**

### A.    **Background**

100.    In Opinion No. 569, the Commission found that the record did not support departing from the traditional use of market-based approaches to determine base ROE.  The Commission found that investors typically do not have the opportunity to invest in an enterprise at its book value.  Accordingly, the Commission deemed it appropriate to exclude the Expected Earnings model, which relies on an enterprise's book value instead of the market value.[203]

101.    The Commission explained that the return on book value is not indicative of the return that an investor requires to invest in the utility's equity or what return an investor receives on the equity investment, because those returns are determined with respect to the current market price that an investor must pay in order to invest in the equity.[204] Specifically, the Commission found that the Expected Earnings model measures returns on book value, without consideration of what market price an investor would have to pay to invest in the relevant company, so it does not accurately measure the investor's expected returns on its investment, and, therefore, has been "thoroughly discredited."[205] In other words, the return on book value does not reflect "the return to the equity owner"

---

[202] *See id.* PP 109-111.

[203] *See* Opinion No. 569, 169 FERC ¶ 61,129 at PP 200-203.

[204] *Id.* P 202.

[205] *Id.* PP 205, 221.

that we must ensure is "commensurate with returns on investments in other enterprises," as *Hope* requires; therefore, the Commission found that this model is not useful in ensuring that these standards are satisfied.[206] Furthermore, the Commission found that there was insufficient record evidence to conclude that investors rely on the Expected Earnings analysis to estimate the opportunity cost of investing in a particular utility.[207]

102.    In addition, the Commission stated that, while the Expected Earnings model does not involve the same complexities as market-based approaches, this is because it does not reflect a utility's cost of equity.  The Commission explained that the Expected Earnings model is simpler because it does not consider the market price that an investor must pay to make its investment and other factors such as projected growth rates for the subject utility.[208]  The Commission also noted that applying the Expected Earnings model in the cost-of-service context would lead to illogical results because a company in such a context would receive a higher overall return when it features a higher equity ratio, despite this indicating a lower risk (and thereby indicating a lower required rate of return by investors) than a company featuring a lower equity ratio.  Similarly, the Commission explained that, even though companies with more depreciated assets are generally of lower risk and therefore would merit a lower return, the Expected Earnings model would instead provide higher returns to such companies.[209]

103.    The Commission considered the disadvantages and advantages of the Expected Earnings model and concluded that, on balance, the disadvantages of that approach outweigh its advantages.[210]

104.    In Opinion No. 569-A, the Commission continued to find that it was appropriate to exclude the Expected Earnings model from its base ROE analysis.[211]  The Commission continued to find a lack of evidence supporting investors' use of earnings per book value data to directly value equities, determine the cost of equity, or make investment decisions without consideration of the market price of the relevant equities.  The Commission found that, as it concluded in Opinion No. 569, investors cannot use the Expected Earnings model to directly determine the return they would earn from purchasing a

---

[206] *Id.* PP 202, 221-222.

[207] *Id.* P 210.

[208] *Id.* PP 203-204.

[209] *Id.* PP 223-224.

[210] *See, e.g.*, *id.* PP 200, 209.

[211] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 125-126.

Document Accession #: 20210715-3076      Filed Date: 07/15/2021

company's stock because the return estimated by that model is a return on the company's book value, not a return on the current stock price that the investor must pay in order to invest in the company. The Commission explained that, therefore, the returns estimated by the Expected Earnings model are divorced from the returns required by investors because investors cannot purchase a company's stock at its book value (except in the very rare instance where a utility's market capitalization happens to exactly equal its book value).[212] The Commission further stated that the decision to exclude the Expected Earnings model from the base ROE analysis is consistent with the Commission's prior consideration of the Expected Earnings model because there, the Expected Earnings model was considered only as corroborative evidence and not used as a direct input in the Commission's ROE calculations. The Commission noted that more convincing evidence is required to justify using the Expected Earnings model as such a direct input.[213]

105.    The Commission also maintained that, just because the Expected Earnings model avoids the complexities, controversies, and limitations of market-based methods as well as provides a unique, non-market-based perspective and increases model diversity, it is not appropriate to include the Expected Earnings model in the base ROE calculation when the model is fatally flawed. The Commission found that the returns on investment received depend on the market price that investors must pay to make their investment, which the accounting-based Expected Earnings model does not consider.[214]

106.    Finally, the Commission reaffirmed its decision in Opinion No. 569 to exclude the Expected Earnings model as a direct input in the calculation of the base ROE because this scenario is vastly different from using the Expected Earnings model as corroborative evidence. Furthermore, the Commission noted that Opinion No. 531, whose logic and methodology the Commission adopted in Opinion No. 551, was vacated by the court, such that neither constitutes binding precedent.[215] However, the Commission did not necessarily foreclose its use in future proceedings if parties can demonstrate that the concerns discussed above have been addressed.[216]

---

[212] *Id.* PP 125-127.

[213] *Id.* P 131.

[214] *Id.* P 129.

[215] *Id.* P 131.

[216] *Id.* P 132.

### B. Briefs

107. Mystic encourages the Commission to adopt the Expected Earnings model and states that the Commission erred in Opinion No. 569 *et seq.* by concluding that the Expected Earnings model is not market-based. Mystic argues that investors consider earnings expectations, an accounting-based metric, to price equity. Additionally, Mystic asserts that the book rate of return estimated in the Expected Earnings model "is comparable to the allowed ROE on a book value rate base being determined in this proceeding."[217] Mystic contends that shareholders are effectively investing at book value every time earnings are retained for reinvestment. Mystic adds that it does not have publicly traded equity and states that "market-based measures aimed solely at the stock price of Exelon are accounting for far more than the value of Mystic 8 & 9, or even Exelon Generation."[218] Mystic asserts that the Expected Earnings model adds value to the Commission's ROE methodology because it is based on book value, as opposed to market value, thereby "serv[ing] the critical function of acting as a check on the possibility that a faulty common market input could undermine the results of the other three models."[219]

108. Mystic argues that "returns on book value are an important consideration in evaluating investment alternatives, particularly in the regulated utility sector where book values play a fundamental role in establishing future earnings and cash flows."[220] Moreover, Mystic declares that "the Commission has cited no evidence to support a finding that either the DCF or the CAPM is used directly by investors as the basis for their decision-making" and asserts that the Expected Earnings provides an equally sound basis for evaluating the required return of an investor, as do the DCF and CAPM.[221] Additionally, Mystic asserts that *Hope* and *Bluefield* require the Commission to allow a return sufficient for the entity at issue to maintain its credit. Mystic notes that credit rating agencies generally consider debt-to-capital and cashflow ratios using the book value of equity.[222] Finally, Mystic contends that current market conditions, including the

---

[217] Mystic Initial Brief at 23-25.

[218] *Id.* at 25.

[219] *Id.* at 26.

[220] *Id.* at 27.

[221] *Id.* at 28.

[222] *Id.* at 29.

Document Accession #: 20210715-3076    Filed Date: 07/15/2021

COVID-19 pandemic and resulting monetary stimulus policies, raise doubts about the assumptions and stability of the DCF and CAPM models.[223]

109.   Trial Staff argues that Mystic's proposed use of the Expected Earnings model is a collateral attack on Opinion No. 569-A and states that "Mystic does not meet its burden to establish a just and reasonable rate under section 205 of the [FPA]" because Mystic does not address the concerns about the Expected Earnings model raised in Opinion No. 569-A.[224]   Trial Staff objects to Mystic's arguments that investors consider the Expected Earnings model and that the Expected Earnings model provides model diversity because Mystic must first demonstrate that the Expected Earnings model is methodologically and legally sound.[225]   Trial Staff witness Dr. Gill disputes Mystic's argument that retained earnings are equivalent to investing at book value, explaining that retained earnings are invested in nothing at all; rather, according to Dr. Gill, investments are only made once those funds are used to purchase an asset, which would be purchased at a market price.   Dr. Gill adds that a firm may reinvest its retained earnings in its stock by repurchasing shares on the open market, but still at the market price; therefore, a firm can only reinvest in itself at book value in the rare case when its market and book prices of equity are equal.   Dr. Gill adds that, because price-to-book ratios are generally greater than one for proxy group companies in this proceeding, the Expected Earnings model will systematically overstate equity investors' required return.[226]   Trial Staff contends that Mystic mischaracterizes academic sources cited to support its conclusion and argues that Mystic ignores 40 years of Commission precedent establishing that investors' required returns are based on market prices.[227]   Similarly, Trial Staff objects to Mystic's arguments related to credit ratings, noting that Opinion Nos. 569 and 569-A found that the Expected Earnings model would not satisfy the capital attraction requirements established in *Hope*.[228]   Trial Staff disagrees with Mystic's arguments related to current market conditions, explaining that the COVID-19 pandemic and other such events occurred after the study period in this proceeding.   Likewise, Trial Staff dismisses Mystic's arguments that the Expected Earnings model adds model diversity, noting that

---

[223] *Id.* at 30-31.

[224] Trial Staff Reply Brief at 7-8.

[225] *Id.* at 10.

[226] *Id.* at 11-13 & n.48 (citing Gill Reply Aff. at PP 16-17).

[227] *Id.* at 14-15.

[228] *Id.* at 16.

the Opinion No. 569-A dismissed such arguments on the grounds that they were already addressed in Opinion No. 569.[229]

110.    ENECOS argues that the Commission should reject Mystic's inclusion of the Expected Earnings analysis.[230]  ENECOS states that, as an initial matter, Opinion Nos. 531, 531-B, and, practically speaking, 551 were vacated by the D.C. Circuit in *Emera Maine*.[231]  ENECOS adds that, more fundamentally, the Commission correctly rejected use of the Expected Earnings analysis in Opinion No. 569 because its use does not satisfy the requirements of *Hope*.[232]  ENECOS states that the Commission already rejected Mystic's argument that Expected Earnings analysis meets the financial integrity standards of *Hope* and *Bluefield* because earnings on book value directly underpin published credit ratings.[233]  ENECOS also disputes Mystic's argument that the recent COVID-19 pandemic supports the use of the Expected Earnings analysis by pointing out that the study period of April 2018 to September 2018 predates this event and that a once-in-a-century, short term aberration does not support the use of a methodology divorced from current market conditions.

111.    Massachusetts AG argues that Opinion Nos. 569 and 569-A correctly rejected reliance on the Expected Earnings methodology and Mystic provides no new arguments to support its attempt to apply this methodology in this proceeding.[234]  Massachusetts AG contends that Mystic's arguments in favor of the methodology have either already been considered and rejected by the Commission or rely on data that is outside of the time period at issue in this proceeding, which renders that data irrelevant.  Massachusetts AG argues that Mystic's argument boils down to one that the Commission has rejected multiple times:  that the Expected Earnings' non-market-based estimate is valuable and should be considered.[235]

112.    Connecticut Parties also disagree with Mystic's use of the Expected Earnings model.  Connecticut Parties recommend that the Commission dismiss arguments that

---

[229] *Id.* at 17-19.

[230] ENECOS Reply Brief at 21-26.

[231] *Id.* at 21 (citing *Emera Maine*, 854 F.3d 9).

[232] *Id.* at 22-23 (citing Opinion No. 569, 169 FERC ¶ 61,129 at PP 201-202).

[233] *Id.* at 24-25 (citing Opinion No. 569, 169 FERC ¶ 61,129 at PP 216).

[234] Massachusetts AG Reply Brief at 16.

[235] *Id.* at 18.

Opinion No. 569 *et seq*. erred in not adopting the Expected Earnings model and assert that arguments related to current market conditions, such as the COVID-19 pandemic, are irrelevant because these events did not occur during the study period.[236]

### C.    Commission Determination

113.    The Commission found in Opinion No. 569 that the Expected Earnings model would not sufficiently improve its ROE determinations to warrant using the model, as discussed above.[237]  The Commission upheld this decision in Opinion No. 569-A[238] and we find that the same is true in this proceeding.  We are not persuaded by Mystic's arguments to include the Expected Earnings model when determining the just and reasonable ROE in this proceeding.

114.    In Opinion No. 569, the Commission explained that, under the Commission's market-based approach, the Commission sets a utility's ROE at the estimated return that investors would require in order to purchase stock in the utility at its current market price. In *Hope*, the Supreme Court explained that "the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks."[239]  The Commission stated that, in order to determine this, the Commission must analyze the returns that are earned on "investments in other enterprises having corresponding risks."  However, investors cannot invest in an enterprise at book value and must instead pay the prevailing market price for an enterprise's equity.  As a result, the Commission stated that the expected return on a utility's book value does not reflect "returns on investments in other enterprises" because book value does not reflect the value of any investment that is available to an investor in the market, outside of the unlikely situation in which market value and book value are exactly equal.  Accordingly, we agree with Trial Staff, ENECOS, Massachusetts AG, and Connecticut Parties and find here that the Expected Earnings model is not a market-based model and relying on it does not satisfy the requirements of *Hope*.

115.    Regarding Mystic's assertion that retained earnings are comparable to investing at book value, we agree with Trial Staff that retained earnings are by definition not invested until used to purchase stock or another asset.  Furthermore, we agree that such a transaction would occur at the market price.  Therefore, we disagree that retained

---

[236] Connecticut Parties Reply Brief at 13-14.

[237] *See* Opinion No. 569, 169 FERC ¶ 61,129 at P 31; *see also* Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 43-46.

[238] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 125-132.

[239] Opinion No. 569, 169 FERC ¶ 61,129 at P 201 (citing *Hope*, 320 U.S. at 603).

Document Accession #: 20210715-3076    Filed Date: 07/15/2021

earnings are comparable to investing at book value. Similarly, we disagree with Mystic's argument that the Expected Earnings model should be adopted because credit rating agencies consider book value-based metrics when evaluating credit risk. As the Commission explained in Opinion No. 569, "although book value and returns on book equity may be useful data points for investors, they do not reflect an opportunity for investment that can be characterized as an opportunity cost."[240]

116.    Additionally, we agree with Trial Staff, ENECOS, Massachusetts AG, and Connecticut Parties that Mystic's arguments related to current market conditions and the COVID-19 pandemic are not relevant to this proceeding, as those events occurred after the study period at issue here.

## VIII.    **Outlier Tests and Natural Break Analysis**

### A.    **High-End Outlier Test**

#### 1.    **Background**

117.    In the *Coakley* Briefing Order, the Commission recognized that the CAPM can produce unsustainably high results for a particular proxy company because, unlike the two-step DCF analysis, it does not include a long-term growth projection based on GDP that would normalize the ROEs produced by the model. Moreover, the Commission recognized that, in unusual circumstances, the two-step DCF analysis could also produce unsustainably high results. Therefore, the Commission proposed to apply a high-end outlier test to the results of both these models.[241]

118.    The Commission proposed to treat as high-end outliers any proxy company whose cost of equity estimated under the model in question is more than 150% of the median result of all of the potential proxy group members in that model before any high or low-end outlier test is applied, subject to a natural break analysis similar to the approach the Commission uses for low-end DCF analysis results. The Commission stated that this test should identify those companies whose cost of equity under the model in question is so far above the cost of equity of a typical proxy company as to suggest that it is the result of atypical circumstances that are not representative of the risk profile of a more normal utility.

---

[240] *Id.* P 210.

[241] As noted below, the high-end outlier test only applies to the DCF model and CAPM because they utilize results of the relevant analysis applied to a proxy group, while the Risk Premium model is derived from actual ROEs.

119. In Opinion No. 569, the Commission adopted the high-end outlier test proposed in the *Coakley* Briefing Order. The Commission found it was necessary to apply a high-end outlier test to the results of the DCF and CAPM models. Additionally, given that the Commission would use the midpoint as the measure of central tendency for region-wide ROEs, the Commission found it appropriate that there be a high-end outlier test to eliminate members of the proxy group whose ROEs were unreasonably high.[242]

120. In Opinion No. 569-A, the Commission found it appropriate to modify the high-end outlier test to treat any proxy company as a high-end outlier if its cost of equity estimated under the model in question was more than 200% of the median, as opposed to 150% of the median. The Commission found that it was appropriate to increase the threshold for the high-end outlier test because doing so would reduce the risk that rational results were inappropriately excluded. The Commission affirmed that it was appropriate to maintain the test as an objective check to help identify observations that were irrationally or anomalously high.[243] The proxy group companies would still be subject to the natural break analysis. In Opinion No. 569-B, the Commission agreed with the determinations in Opinion 569-A, continuing to find that it is appropriate to treat any proxy company as a high-end outlier if its cost of equity estimated is more than 200% of the median.[244]

## 2.  **Briefs**

121. Massachusetts AG argues that Opinion No. 569-A provides no justification for why 200% of the median is required instead of 150% of the median for the high-end outlier test. Massachusetts AG argues that as a result, Opinion No. 569-A's methodology results in a zone of reasonableness that is upwardly biased on both ends, resulting in a range that is unreliable and unpredictive of the return required to satisfy the requirements of *Hope* and *Bluefield*. Instead, Massachusetts AG encourages the Commission to "adopt a statistically sound method for excluding high-end outliers, such as the use of two standard deviations."[245]

122. Connecticut Parties encourage the Commission not to apply the high-end outlier test as revised in Opinion No. 569-A. They state that the revised test's threshold of 200%

---

[242] Opinion No. 569, 169 FERC ¶ 61,129 at PP 375-376.

[243] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 154-155.

[244] Opinion No. 569-B, 173 FERC ¶ 61,159 at PP 140-142.

[245] Massachusetts AG Initial Brief at 15-16.

Document Accession #: 20210715-3076     Filed Date: 07/15/2021

of the median "increases the likelihood that proxy companies with illogically high ROE results will nevertheless be included in the analysis."[246]

123.     Mystic witnesses Dr. Vilbert and Mr. Sheilendranath state that Trial Staff witness Dr. Gill incorrectly calculates the high-end outlier test in his DCF analysis by removing from the proxy group companies whose ROEs are below the low-end outlier test threshold.  Dr. Vilbert and Mr. Sheilendranath argue that the Commission stated in Opinion No. 569-A that the high-end outlier test should be calculated based on the proxy group before outlier tests are applied.[247]

### 3.     Commission Determination

124.     We deny Massachusetts AG's proposal to adopt an alternative high-end outlier test based on standard deviations.  In Opinion No. 569, the Commission found arguments for a similar proposal unpersuasive because statistical methodologies may be based on assumptions that do not hold for the data, such as the distribution of the underlying population being normal.[248]  The Commission explained that these underlying assumptions may not always hold for a given proxy group, especially a small proxy group.  Thus, the Commission found that its high-end outlier test has the advantage that it is relatively easy to carry out, places a well-defined upper bound on the proxy group, and can be used with small proxy groups because it utilizes a percentage differential compared to the median.

125.     We also deny Connecticut Parties' proposal to not apply the high-end outlier test in this proceeding.  In Opinion No. 569, the Commission adopted the high-end outlier test for the CAPM and DCF models, as those models may produce unsustainably high results for a particular proxy company in unusual situations.  Therefore, the Commission found it necessary to apply a high-end outlier test to the results of these methods.  However, the Commission rejected MISO TO's proposal to use 150% of the highest median ROE produced by either the DCF or CAPM models as the high-end outlier test for both models.  The Commission noted that each model is based on different assumptions and thus estimates the cost of equity in different ways and therefore, the Commission found that the determination of whether each model produces one or more extreme or illogical

---

[246] Connecticut Parties Initial Brief at 3.

[247] Mystic Reply Brief Attach. A at 18 (citing Opinion No. 569-A, 171 FERC ¶ 61,154 at P 154).

[248] Opinion No. 569, 169 FERC ¶ 61,129 at P 376 (*See, e.g.*, MISO TOs Reply Br. (I), App. 2 McKenzie Reply Aff. (I) at 107 ("Under Mr. Solomon's paradigm, where the standard deviation serves as a relevant measure of dispersion, the distribution is assumed to be perfectly normal.")).

Document Accession #: 20210715-3076          Filed Date: 07/15/2021

results is best determined by examining the dispersion of the ROE estimates produced by that model.[249]  Subsequently, in Opinion No. 569-A, the Commission modified the high-end outlier test to treat any proxy company as a high-end outlier if its cost of equity estimated under the model in question is more than 200% of the median—as opposed to the 150% of the median threshold applied in Opinion No. 569—result of all of the potential proxy group members in that model before any high or low-end outlier test is applied, subject to a natural break analysis.[250]  We continue to find the high-end outlier test, as modified by Opinion 569-A, to be an appropriate test to identify proxy group ROEs that are irrationally or anomalously high.  The high-end outlier test did not eliminate any proxy group members in this proceeding.  Furthermore, no proxy group companies for the CAPM or DCF featured costs of equity exceeding even 150% of the median.

126.    We agree with Dr. Vilbert and Mr. Sheilendranath that the high-end outlier test is properly calculated using all proxy group members before applying outlier screens.  Accordingly, any proxy group companies removed by the low-end outlier test should still be included in the calculation of the high-end outlier test threshold.

##### B.    Low-End Outlier Test

###### 1.    Background

127.    In Opinion No. 531, in screening the proxy groups for outliers, the Commission affirmed the Presiding Judge's application of the Commission's low-end outlier test in that proceeding, explaining that the "purpose of the low-end outlier test is to exclude from the proxy group those companies whose ROE estimates are below the average bond yield or are above the average bond yield but are sufficiently low that an investor would consider the stock to yield essentially the same return as debt."[251]  The Commission explained that "[i]n public utility ROE cases, the Commission has used 100 basis points above the cost of debt as an approximation of this threshold, but has also considered the distribution of the proxy group companies to inform its decision on which companies are outliers."[252]

---

[249] *Id.* P 377 (citing Ex. JCI-107 at 29).

[250] The high-end outlier test only applies to the DCF model and CAPM because they utilize results of the relevant analysis applied to a proxy group, while the Risk Premium model is derived from actual ROEs.

[251] Opinion No. 531, 147 FERC ¶ 61,234 at PP 121-122.

[252] *Id.*

128.    In the *Coakley* Briefing Order, under the Commission's existing low-end outlier test, companies whose ROE fails to exceed the average 10-year bond yield by approximately 100 basis points are excluded from the proxy group on the ground that investors generally cannot be expected to purchase a common stock if debt, which has less risk than a common stock, yields essentially the same expected return.[253]  In the *Coakley* Briefing Order, the Commission proposed to continue to use this test for purposes of the CAPM and Expected Earnings analyses as well as the DCF analysis.[254]

129.    In Opinion No. 569, the Commission adjusted the low-end outlier test to eliminate from the proxy group ROE results that are less than the yields of generic corporate Baa bonds plus 20% of the CAPM risk premium.  The Commission found that it was necessary to exclude ROEs whose yield was "essentially the same expected return" as debt in order to determine the low end of the zone of reasonableness.  The Commission noted that the risk premium that investors demand changes over time and found that using 20% of the CAPM risk premium struck an appropriate balance of accounting for the additional risk of equities over bonds while not inappropriately excluding proxy group members whose ROE is distinguishable from debt.[255]  In Opinion No. 569-A, the Commission agreed with the Commission's decision on the low-end outlier test in Opinion No. 569.[256]

## 2.    Briefs

130.    Massachusetts AG argues that the CAPM risk premium produces unrealistically high results because it does not contain a long-term growth component.  Therefore, according to Massachusetts AG, the low-end outlier test "leads to a low-end threshold

---

[253] *S. Cal Edison*, 131 FERC ¶ 61,020 at PP 54-56, *remanded on other grounds sub nom. S. Cal. Edison v. FERC*, 717 F.3d at 183-87; *Pioneer Transmission, LLC*, 126 FERC ¶ 61,281, at P 94 (2009), *reh'g denied*, 130 FERC ¶ 61,044 (2010).  In *S. Cal Edison*, the Commission stated that it also eliminated companies that had ROEs less than 100 basis points above the Moody's bond yield for that particular rating in *Atl. PATH 15*, 122 FERC ¶ 61,135 (2008) and in *Startrans IO. L.L.C.*, 122 FERC ¶ 61,306 (2008). *S. Cal Edison*, 131 FERC ¶ 61,020 at P 54.

[254] *Coakley* Briefing Order, 165 FERC ¶ 61,030 at P 51.

[255] Opinion No. 569, 169 FERC ¶ 61,129 at PP 387-389.

[256] Opinion No. 569-A, 171 FERC ¶ 61,154 at PP 161-162.

that is higher than is justified and artificially curtails the low end of the zone of returns the Commission can consider."[257]

131.    ENECOS takes issue with the Commission's substitution of 20% of the CAPM risk premium for the 100 basis margin over the cost of debt.[258]   ENECOS states that one complication is that the low value threshold depends on whether the source of the forecast earnings growth rates is IBES or *Value Line*.  ENECOS observes that IBES yields a low value threshold of 6.69% while *Value Line* yields that of 6.37% and contends that this discords with an implication in Opinion No. 569—that the two low end outlier threshold values would be considered by investors to be equivalent since each theoretically represent "essentially the same expected return as debt."[259]   ENECOS adds that the Commission's core statement on this point—that "as bond yields decline, the ROE that investors would consider to yield 'essentially the same expected return' as a bond is increasingly higher than the corresponding bond yield"—is not supported by empirical research.  ENECOS argues that the relationship between bond yields and risk premium has, in fact, been positive and negative over time.[260]

132.    Connecticut Parties encourage the Commission not to apply the low-end outlier test in this proceeding and state that the revised test "raises the floor" and "increases the likelihood that proxy companies with economically logical ROE results will be excluded from the analysis."[261]

### 3.    Commission Determination

133.    We decline to revise the low-end outlier test here, and we apply the low-end outlier test adopted in Opinion No. 569.  In Opinion No. 569, the Commission revised its low-end outlier test to include a risk premium instead of a generic basis point spread as proposed in the *Coakley* Briefing Order.  The Commission stated that, because the risk premium that investors demand changes over time, it is imprecise to simply add 100 basis points to the bond yield.  Therefore, the Commission adopted a low-end outlier test that eliminates from the proxy group ROE results that are less than the yields of generic corporate Baa bonds plus 20% of the CAPM risk premium.  The Commission found that it was necessary to exclude ROEs whose yield was "essentially the same expected return"

---

[257] Massachusetts AG Initial Brief at 15.

[258] ENECOS Initial Brief at 7-12.

[259] *Id.* at 9 (quoting Opinion No. 569, 169 FERC ¶ 61,129 at P 387).

[260] *Id.* at 9-10.

[261] Connecticut Parties Initial Brief at 3.

as debt in order to determine the low end of the zone of reasonableness. Additionally, the Commission noted that the risk premium that investors demand changes over time and found that using 20% of the CAPM risk premium struck an appropriate balance of accounting for the additional risk of equities over bonds while not inappropriately excluding proxy group members whose ROEs are distinguishable from debt.[262] Accordingly, we continue to find that the low-end outlier test adopted in Opinion No. 569 properly excludes companies from the proxy group with ROEs that are so low that they should not be considered in determining the low end of the zone of reasonableness.

134. We disagree with Massachusetts AG's assertion that the low-end outlier test produces an unrealistically high threshold without a long-term growth component. As discussed above, the Commission's rationale for incorporating a long-term growth rate estimate in the DCF analyses for public utilities is that it is often unrealistic and unsustainable for high short-term growth rates to continue in perpetuity for a particular utility or group of utilities, whereas the purpose of the DCF analysis in the CAPM model is to determine the required return on the overall market that will be used to determine the risk premium.[263]

135. We also disagree with ENECOS's assertion that the fact that the low-end outlier test's threshold will change based on which set of growth rates are used in the CAPM renders the low-end outlier test's results invalid. Rather, this is an extension of the diversity of data sources that the Commission sought to introduce in Opinion No. 569-A by considering the use of *Value Line* growth rates.[264] To the extent that the low-end outlier test yields different results based on the set of growth rates used, parties are free to demonstrate why one set of growth rates, including their effects on the calculation of the low-end outlier test threshold, is more appropriate than the other to use in a particular proceeding.

## C.   Natural Break Analysis

### 1.   Background

136. In the Briefing Order, the Commission proposed to apply its low-end and high-end outlier screens, subject to a natural break analysis. The natural break analysis determines whether certain proxy group companies screened as outliers, or those almost screened as outliers, truly represent outliers and should thus be removed from the proxy group. Typically, this involves examining the distance between that proxy group company and

---

[262] Opinion No. 569, 169 FERC ¶ 61,129 at PP 184-185.

[263] *Id.* at PP 264-265.

[264] *See* Opinion No. 569-A, 171 FERC ¶ 61,154 at P 78.

the next closest proxy group company and comparing that to the dispersion of other proxy group companies.[265]  The Commission did not explicitly define how large of a difference constitutes a natural break.

137.    In Opinion No. 569, the Commission continued to apply the natural break analysis to outlier screens and declined to enumerate a rigid formula for the application of the natural break analysis.  The Commission clarified that it would apply the natural break analysis to both the low-end and high-end outlier tests and that the natural break analysis may justify inclusion of companies in the proxy group despite their failing either the low or high-end outlier test.[266]  In Opinion No. 569-A, the Commission maintained the natural break analysis but clarified that it can be used to both exclude ROEs that pass either outlier test or include ROEs that fail either outlier test.[267]

## 2.    Commission Determination

138.    No party contests the use of natural break analyses in the DCF and CAPM models.  Accordingly, both the DCF and CAPM models used here will be subject to natural break analyses, consistent with Opinion No. 569 *et seq*.

## IX.    Proxy Group Selection

139.    Both the DCF and CAPM models use proxy groups to determine a range of reasonable returns.  In the *Coakley* Briefing Order,[268] the Commission stated that it intends to continue to use the same screens for developing a proxy group as the Commission has used in recent cases, including Opinion Nos. 531[269] and 551.[270]  Those five screens are:  (1) the use of a national group of companies considered electric utilities by *Value Line*;[271] (2) the inclusion of companies with credit ratings no more than

---

[265] *See, e.g.*, *S. Cal Edison*, 131 FERC ¶ 61,020 at P 56 (applying a natural break analysis to exclude from the proxy group a company whose ROE was 102 basis points above the applicable bond yield).

[266] Opinion No. 569, 169 FERC ¶ 61,129 at PP 395-397.

[267] *Id.* PP 145-146.

[268] *Coakley* Briefing Order, 165 FERC ¶ 61,030 at P 51.

[269] Opinion No. 531, 147 FERC ¶ 61,234 at P 97.

[270] Opinion No. 551, 156 FERC ¶ 61,234 at P 20.

[271] Opinion No. 531, 147 FERC ¶ 61,234 at PP 96, 100-102.

one notch above or below the utility or utilities whose ROE is at issue;[272] (3) the inclusion of companies that pay dividends and have neither made nor announced a dividend cut during the six-month study period;[273] (4) the inclusion of companies with no merger activity during the six-month study period that is significant enough to distort the study inputs;[274] and (5) companies whose ROE results pass threshold tests of economic logic, including both a low-end outlier test and a revised high-end outlier test proposed in the *Coakley* Briefing Order.

140.    The first four screens listed above evaluate particular characteristics of potential proxy group companies.  They do not vary depending upon the results of the DCF or CAPM analyses.  Accordingly, those screens may be used to develop a starting group of proxy companies eligible for inclusion in the proxy group to be used for the purposes of both the DCF and CAPM analyses.

###    A.    **Mystic's Proposed Revenue Screen**

###        1.    **Briefs**

141.    Mystic witness Dr. Charles E. Olson proposes to remove from the proxy group any company with revenues less than $2 billion.  Dr. Olson explains that Exelon's 2017 revenues were $30 billion and that "size is a measure of risk."[275]

142.    ENECOS asserts that Mystic's proxy group selection is inconsistent with Opinion No. 569-A and Commission precedent.[276]  ENECOS claims that Mystic's exclusion of Black Hills Corporation (Black Hills) and NorthWestern Corporation (NorthWestern) is inappropriate because the exclusions are based on a $2 billion revenue threshold that is unsupported by any instance where the Commission accepted its use.  ENECOS asserts that exclusion of companies below annual revenues of $2 billion dollars is arbitrary and not germane to the company's risk.  ENECOS claims that the Commission's credit risk

---

[272] The Commission requires use of both S&P corporate credit ratings and Moody's issuer ratings when both are available. *Id.* P 107.

[273] *Id.* P 112.

[274] *Id.* P 114; Opinion No. 551, 156 FERC ¶ 61,234 at PP 37-43.

[275] Exhibit No. MYS-010 at 13.

[276] ENECOS Reply Brief at 8-13.

Document Accession #: 20210715-3076    Filed Date: 07/15/2021

band screen already adequately addresses this issue and that companies within one notch of Exelon presumably have similar financial risk.[277]

143.    Connecticut Parties encourage the Commission not to adopt Mystic's revenue proxy screen.  First, Connecticut Parties argue that the screen is not supported by Opinion No. 569-A or by economic logic and should be rejected.  Second, Connecticut Parties argue it is undisputed that Opinion No. 569-A's credit rating screen already accounts for company size and that applying a revenue screen on top of the credit rating screen is redundant.[278]  Third, Connecticut Parties state the $2 billion threshold is arbitrary and needs a rational basis for selecting such a threshold.[279]  Fourth, Connecticut Parties argue that Mystic witnesses Dr. Vilbert and Mr. Sheilendranath do not defend the revenue screen or address the arguments against the screen raised by other parties.[280]

144.    Massachusetts AG also disagrees with Mystic's proposed revenue screen. Massachusetts AG contends that the revenue screen is not supported by Commission precedent and "has the effect of skewing the results of Mystic's analysts upwards.[281]

## 2.    **Commission Determination**

145.    We decline to adopt Mystic's proposed screen to remove from the proxy group companies whose revenues are less than $2 billion.  As ENECOS and Connecticut Parties correctly note, although size is a part of a company's risk profile, the existing credit rating screen already accounts for company size.  As such, we find that Mystic's proposed screen is duplicative and unnecessary.

## B.    **Proposed Exclusion of Electric-Only Utilities**

### 1.    **Briefs**

146.    Consistent with the testimony of Mystic's original witness, Dr. Olson, and the testimony of Mystic's subsequent witnesses, Dr. Vilbert and Mr. Sheilendranath, ENECOS witness Dr. Lesser proposes to exclude from the proxy group companies that did not provide both electric and natural gas service.  Dr. Lesser states that this

---

[277] *Id.* at 9-10.

[278] Connecticut Parties Reply Brief at 4.

[279] *Id.* at 3-4.

[280] *Id.* at 5.

[281] Massachusetts AG Reply Brief at 7-8.

eliminated four companies from consideration: El Paso Electric Co. (El Paso Electric); FirstEnergy Corp. (FirstEnergy); IDACORP Inc. (IDACORP); and PNM Resources Inc. (PNM Resources).[282]

147.    Trial Staff does not recommend that the Commission exclude companies that do not provide both electric and natural gas service. Trial Staff states that, while Mystic excludes the same four companies mentioned by Dr. Lesser, "Mystic removes these companies due to the revenue threshold" and not because of the lack of natural gas service cited by Dr. Lesser. Trial Staff asserts that "ENECOS provides no basis for this criterion other than it is consistent with Dr. Olson's proxy group criteria."[283] Trial Staff explains that "Dr. Olson began his proxy group selection by compiling a 'group of electric and combination utilities covered by The Value Line Investment Survey as *electric utilities*" and adds that "[n]owhere does Dr. Olson apply a criterion to eliminate those *Value Line* electric utilities that are not combinations."[284]

## 2.    Commission Determination

148.    We find that El Paso Electric, FirstEnergy, IDACORP and PNM Resources are all properly included in the proxy group. As Trial Staff correctly notes, the Commission's screening criteria requires that the proxy group company be considered by *Value Line* to be an electric utility; it does not exclude a company based on whether or not the company also operates in other segments, such as natural gas. The record in this proceeding does not contain any evidence demonstrating that such a screen is appropriate here. Accordingly, we decline to exclude these companies based on whether they also have natural gas operations.

149.    Dr. Lesser states that Dr. Olson removes these four companies from the proxy group because they do not provide both electric and natural gas service. However, we note that Dr. Olson's testimony does not appear to contain such a statement.[285]

---

[282] Exhibit No. ENC-0400 at 20:10-14 (citing Exhibit No. ENC-0300 at 41:16-20).

[283] Trial Staff Reply Brief at 35.

[284] *Id.* at 36 (citing *Id.* Attach. A at P 46). (emphasis original).

[285] *See* Exhibit No. MYS-010 at 13-14.

C.    **Avangrid**

1.    **Briefs**

150.    Mystic includes Avangrid, Inc. (Avangrid) in its proxy group and states that "Avangrid meets every one of the Commission's proxy group screening criteria."[286]

151.    ENECOS argues that Avangrid is properly excluded from the proxy group because its stock price was distorted during the study period.  ENECOS explains that Iberdrola, S.A. owned 81.5% of Avangrid during the study period, making Avangrid a controlled company.  ENECOS asserts that this ownership structure introduces distortions like that of major corporate restructuring activity because the stock price would be lowered versus comparable firms, thereby artificially increasing Avangrid's DCF result.  ENECOS notes that Avangrid's own filing with the Securities and Exchange Commission contains statements confirming that its stock price was potentially lowered due to Avangrid's controlled status.[287]

152.    Trial Staff also recommends excluding Avangrid from the proxy group "based on [merger and acquisition (M&A)] activity and the fact that until recently it was a closely-held company."[288]  Trial Staff notes that, if Avangrid is not excluded due to these factors, Avangrid has the highest DCF result and lowest CAPM result of the proxy group. Trial Staff explains that Avangrid will still be excluded from both the DCF and CAPM models under either outlier tests or natural break analyses and argue that this is further evidence that Avangrid is properly excluded from the proxy group.[289]

153.    Connecticut Parties state that Avangrid should be excluded due to three reasons. First, at the time of study, Avangrid was a relatively new entity and its lack of financial records makes it more difficult for analysts to assess growth prospects for the company. Second, Connecticut Parties argue that, while Avangrid's debt has a similar risk profile to Exelon's debt, Avangrid's equity is far riskier than Exelon's equity due to Avangrid's controlled status.  Third, Connecticut Parties argue that Avangrid is not comparable to the

---

[286] Mystic Reply Brief at 7.

[287] ENECOS Initial Brief at 11; ENECOS Reply Brief at 11-12 (citing Avangrid 2018 SEC Form 10-K, at 42).

[288] Trial Staff Reply Brief at 33.

[289] *Id.* at 34-35.

Document Accession #: 20210715-3076     Filed Date: 07/15/2021

other companies in the proxy group because it has maintained an unusually high equity ratio and no other company in the proxy group has such a high equity ratio.[290]

154.   In response, Mystic states that "[a]ll the Parties agree that Avangrid meets every one of the Commission's proxy group screening criteria."[291]  Mystic notes that two recent Initial Decisions dismissed similar arguments against including Avangrid in the proxy groups for those proceedings.[292]  Mystic characterizes other parties' assertions that Avangrid's stock price was distorted as speculative, unsupported, and insufficient to warrant excluding Avangrid.  Furthermore, Mystic contends that Avangrid's stock price was not distorted by a control premium because Avangrid's stock price has moved in-line with the S&P Utility Index, its dividend policy has remained consistent, and there is no evidence that its growth rate estimates are distorted.[293]

## 2.  Commission Determination

155.   A controlled company will generally have a lowered stock price when compared to an uncontrolled but otherwise identical company because minority investors in a controlled company cannot influence the company's strategy through shareholder votes.  Additionally, the controlled company may act in a way that best suits the parent company's overall strategy and not necessarily pursue value maximization for its shareholders.  In the DCF, the stock price appears in the denominator of the dividend yield portion of the calculation.  Therefore, when a company's stock price is artificially lowered, its dividend yield will in turn be artificially high.  This renders its DCF result an inaccurate representation of the market cost of capital.

156.   Normally, the Commission excludes from the proxy group any company that, during the study period, was involved in M&A activity significant enough to distort the company's estimated ROE model inputs.  Avangrid's status as a controlled company is not M&A activity.  Nevertheless, we find that its effect on Avangrid's ROE model inputs

---

[290] Connecticut Parties Initial Brief at 6-7.

[291] Mystic Reply Brief at 7.

[292] *Id.* at 7-8 (citing *DATC Path 15, LLC*, 169 FERC ¶ 63,021, at PP 46-51 (2019) (finding that statements indicating that Avangrid's stock price may be distorted constituted insufficient evidence to prove that such distortion had occurred and that the record failed to demonstrate that DATC's risk profile meaningfully differed from Avangrid's); *Belmont Municipal Light Department*, 162 FERC ¶ 63,026, at PP 191-192 (2018) (finding that EMCOS had not met its burden to present evidence demonstrating that Avangrid should be excluded due to its ownership structure)).

[293] *Id.* at 8-9.

was significant and comparable to that of M&A activity.[294] We also note that the proxy group screens broadly exist to exclude companies whose risk and business differ materially from the utility or utilities at issue. Avangrid, though not technically a subsidiary, is by virtue of the overwhelming ownership share by Iberdrola, a diversified foreign-domiciled corporation that is not listed by *Value Line* as an electric utility and that receives the vast majority of revenue from outside of North America. Therefore, Avangrid meaningfully differs in both valuation and risk from other proxy group members. Accordingly, we find that Avangrid is properly excluded from the proxy group.[295]

### D.    **Dominion and Sempra**

#### 1.    **Briefs**

157.    Mystic includes Dominion Resources (Dominion) and Sempra Energy Corp. (Sempra) in its proxy group. Mystic states that "[e]ach company satisfies the Commission's screening criteria and [no] party provided persuasive evidence that any merger or acquisition activity . . . caused distortions in any model input that were unsustainable or unrepresentative of longer-term investor expectations for the company."[296]

158.    ENECOS contends that Dominion is properly excluded from the proxy group due to its ongoing acquisition of SCANA Corporation (SCANA) during the study period.[297] Specifically, ENECOS argues that Dominion underwent merger activity "significant enough to distort the study inputs" and therefore should be excluded from the proxy

---

[294] We note that, in the Avangrid 10-K filing cited by ENECOS, Avangrid states that Iberdrola's "significant concentration of ownership may adversely affect the trading price for shares of our common stock because investors may perceive disadvantages in owning stock in companies with shareholders who own significant percentages of a company's outstanding stock." Avangrid 2018 SEC Form 10-K at 42. This disclaimer suggests that Avangrid's stock price could have been distorted during the study period due to its status as a controlled company.

[295] Additionally, because Avangrid is removed from the proxy group before the calculation of the DCF and CAPM ROE estimates, we decline to address whether Avangrid would be excluded under the outlier test or the natural break analysis, as argued by Trial Staff.

[296] Mystic Initial Brief at 4.

[297] ENECOS Initial Brief at 11-12.

group.[298]  ENECOS asserts that when Dominion announced it would acquire SCANA, Dominion's stock price fell 3.85% while the S&P 500 index rose 0.064% and maintained this drop throughout the study period.[299]

159.    In response to Mystic's inclusion of Dominion in the proxy group, Trial Staff maintains that it should be excluded due to M&A activity.[300]  Specifically, Trial Staff witness Mr. Robert J. Keyton argues that Dominion's acquisition of SCANA for $14.6 billion was sufficient to distort Dominion's stock price, in part because the deal involved Dominion assuming SCANA's debts.[301]  Likewise, Trial Staff supports removing Sempra from the proxy group based on M&A activity.[302]  Mr. Keyton notes that "[o]n June 11, 2018, Sempra's stock price spiked due to reports" that an activist hedge fund "urged a board shakeup and strategic review of the company's business, sending its shares surging as much as 18 percent."[303]  Mr. Keyton also notes that on June 28, 2018, Sempra announced that it "intend[ed] to sell several energy infrastructure assets, including its entire portfolio of U.S. wind and U.S. solar assets, as well as certain U.S. midstream assets."[304]  Additionally, Trial Staff witness Dr. Gill states that "ENECOS previously excluded Sempra on the basis of M&A activity but now includes Sempra in its proxy group" and adds that "[t]he Lesser September 28 Affidavit does not explain why Sempra is now included in its proxy group."[305]

160.    Connecticut Parties argue that Dominion and Sempra should be excluded due to the Commission's policy to exclude any company engaged in M&A activity significant enough to distort the DCF inputs.  Connecticut Parties argue that Dominion's engagement in the then-pending acquisition of SCANA should exclude Dominion from the proxy group.  Connecticut Parties argue that Dominion's purchase of $6.8 billion in stock, a substantial figure relative to Dominion's market cap of $46 billion, and their assumption of SCANA's debt would distort Dominion's DCF inputs, justifying its

---

[298] *Id*. at 11-12.

[299] ENECOS Reply Brief at 11.

[300] Trial Staff Reply Brief at 32.

[301] Exhibit No. S-0009 at 30:14-20 (citing Exhibit No. S-0013 at 176).

[302] Trial Staff Reply Brief at 32.

[303] Exhibit No. S-0009 at 31:19-23 (citing Exhibit No. S-0013 at 183-186).

[304] *Id.* at 32:10-14 (citing Exhibit No. S-0013 at 195).

[305] Trial Staff Reply Brief, Gill Reply Aff. at P 46.

exclusion from the proxy group.  Connecticut Parties argue that Sempra should be excluded due to its $9.45 billion acquisition of Oncor Energy Delivery, one third of Sempra's total market capitalization of $29 billion.[306]

161.    Massachusetts AG also argues that Dominion and Sempra are properly excluded from the proxy group on the basis of ongoing M&A activity.[307]

162.    Mystic argues that other parties incorrectly apply the legal standard for the M&A screen by removing any company involved in M&A activity during the study period. However, according to Mystic, "the Commission clearly stated in Opinion No. 569 that the merger activity must be 'significant enough to distort the study inputs in order to warrant proxy group exclusion.'"[308]  Mystic contends that there is no evidence supporting a finding that Dominion or Sempra's M&A activity had any effect on the ROE study inputs.

## 2.    Commission Determination

163.    We find that Dominion and Sempra are both properly excluded from the proxy group in this proceeding.  We disagree with Mystic that the record contains no evidence demonstrating that either company was engaged in M&A activity significant enough to distort ROE model inputs.  In fact, the evidence provided by Mr. Keyton demonstrates that the companies' significant M&A activity during the study period distorted the companies' stock prices,[309] thereby making their ROE results inaccurate measures of the market cost of capital.

## E.    Edison International

### 1.    Briefs

164.    Mystic, ENECOS, and Connecticut Parties excluded Edison International from their proxy groups, while Trial Staff argues that Edison International should be included in the proxy group.  Trial Staff explains that "Moody's downgraded EIX from a rating of A3 to a rating of Baa1 in September 2018, making EIX eligible for inclusion in the DCF

---

[306] Connecticut Parties Initial Brief at 4-6 (citing Exhibit No. CT-001 at 14).

[307] Massachusetts AG Reply Brief at 7.

[308] Mystic Reply Brief at 4.

[309] *See* Exhibit No. S-0013 at 176-77, 183-86, 195-96.

proxy group."[310] Trial Staff states that it alone included Edison International in the DCF proxy group.[311] According to Trial Staff, Mystic, ENECOS, and Connecticut Parties have not provided any rationale for excluding Edison International and therefore, Trial Staff argues, the Commission should include it in the proxy group.

165.   In its reply brief, Mystic agrees with Trial Staff's explanation and inclusion of Edison International.[312]

## 2.    Commission Determination

166.   We agree with Trial Staff and Mystic that Edison International is properly included in the proxy group.  As Trial Staff demonstrated, Edison International's credit downgrade during the study period made it eligible for inclusion under the Commission's credit rating screening criteria.

## X.    Results

### A.    Composition of the Starting Proxy Group

167.   The record in this proceeding contains sufficient data to include the following companies in the analysis:  Ameren Corp. (Ameren); Avangrid; Black Hills; CMS Energy Corp. (CMS); Dominion; DTE Energy Corp. (DTE); Edison International; El Paso Electric; Entergy Corp. (Entergy); Exelon; FirstEnergy; IDACORP; NorthWestern; OGE Energy Corp. (OGE Energy); Otter Tail Corp. (Otter Tail); PNM Resources; Public Service Enterprise Group, Inc. (PSEG); and Sempra.

168.   As discussed above, we exclude Avangrid, Dominion, and Sempra from the proxy group.  Therefore, the proxy group contains the following 15 companies:  Ameren, Black Hills, CMS, DTE, Edison International, El Paso Electric, Entergy, Exelon, FirstEnergy, IDACORP, NorthWestern, OGE Energy, Otter Tail, PNM Resources, and PSEG.

### B.    DCF Analysis

169.   As discussed above, we have found that:  (1) only the IBES short-term growth projections should be used for calculating the (1+.5g) adjustment to the dividend yield; (2) a low-end outlier test applies under which we exclude from the proxy group companies with ROEs that do not exceed the Baa bond yield by at least 20% of the risk

---

[310] Trial Staff Initial Brief at 23.

[311] *Id*.

[312] Mystic Reply Brief at 3 n.3.

premium from the CAPM analysis; (3) the high-end outlier test should be calculated using 200% of the median of the proxy group before any outlier tests are applied; and (4) the long-term growth rate should be given 20% weighting and the short-term growth rate 80% weighting in the two-step DCF model.

170.    As discussed below, the risk premium from the CAPM analysis is 10.07%. 20% of that risk premium is 201 basis points.  Adding 201 basis points to the 4.68% Baa bond yield produces a low-end outlier threshold of 6.69%, subject to the natural break analysis.  We exclude IDACORP, Entergy, and FirstEnergy based on this low-end outlier test.  IDACORP features an ROE of 6.17% while Entergy and FirstEnergy have negative growth rates.  NorthWestern, with an ROE estimate of 6.76%, has the lowest DCF ROE estimate of any company included in the proxy group.

171.    Under the high-end outlier test we have adopted in this order, we would, subject to the natural break analysis, exclude any DCF ROE that is more than 200% of the median of the starting proxy group DCF ROE estimates.  In this case, the median of the starting proxy group DCF ROE estimates is 7.71%.  200% of that median is 15.42%.  We do not exclude any company from the DCF proxy group under the high-end outlier test.  The company with the highest DCF ROE estimate in the starting proxy group is Otter Tail with an ROE estimate of 11.07%.  Therefore, the DCF zone of reasonableness is 6.76% to 11.07%.  The median DCF ROE estimate is 8.12%, which is the average of the estimates for OGE Energy (8.54%) and Exelon (7.71%).

## C.    **CAPM Analysis**

172.    As discussed above, we have adopted ENECOS's IBES-based one-step DCF analysis of the S&P 500 for the expected market premium.  This analysis shows an expected market return of 13.15% and a risk premium of 10.07%.

173.    We now turn to the issue of whether any company in the starting proxy group should be excluded from the CAPM proxy group as a low- or high-end outlier.  As discussed in the preceding section, we have determined that the low-end outlier threshold is 6.69%, subject to the natural break analysis.  We do not exclude any company from the CAPM proxy group under the low-end outlier test.  Exelon, with an ROE estimate of 8.27%, has the lowest CAPM ROE estimate of any company included in the proxy group.

174.    Under the high-end outlier test that we have adopted in this order, we would exclude from the CAPM proxy group any ROE estimate that is more than 200% of the median of the starting proxy group CAPM ROE estimates, subject to a natural break analysis.  In this case, the median of the starting proxy group CAPM ROE estimates is 10.01%.  200% of that median is 20.01%.  We do not exclude any company from the CAPM proxy group under the high-end outlier test.  The company with the highest CAPM ROE estimate in the starting proxy group is Otter Tail with an ROE estimate of

11.94%.  Therefore, the CAPM zone of reasonableness is 8.27% to 11.94%.  The median CAPM ROE estimate is 10.01%.

### D.     Risk Premium

175.   As shown in appendix D, the Risk Premium model produces an ROE estimate of 9.85%.

### E.     Just and Reasonable ROE

176.   As discussed above, we use the average of the median estimates from the DCF and CAPM models and the point estimate of the Risk Premium model to establish the just and reasonable ROE in this proceeding.  The median DCF ROE estimate is 8.12%, the median CAPM ROE estimate is 10.01%, and the Risk Premium point estimate is 9.85%.  The average of those values is 9.33%.  Therefore, we find that 9.33% is the just and reasonable base ROE for the Mystic Agreement.

The Commission orders:

(A)     The base ROE for the Mystic Agreement is set at 9.33%, effective as of June 1, 2022, as discussed in the body of this order.

(B)     Mystic is directed to submit a compliance filing within 30 days of the date of this order revising the Mystic Agreement to reflect a 9.33% base ROE, as discussed in the body of this order.

By the Commission.  Commissioner Chatterjee is not participating.
                    Commissioner Danly is concurring with a separate statement attached.
                    Commissioner Clements is dissenting with a separate statement attached.

( S E A L )

Debbie-Anne A. Reese,
Deputy Secretary.

**Appendices**

A.   **Overall Results**

| DCF | 8.12% |
|---|---|
| CAPM | 10.01% |
| Risk Premium | 9.85% |
| Overall Result | 9.33% |

B.   **DCF**

| Line | Company | Unadj. Div. Yield | Short-term Yahoo! Finance | Long-term GDP | Comp. Growth | Adj. Div. Yield | DCF Results | Outliers |
|---|---|---|---|---|---|---|---|---|
| 1 | Otter Tail Corp. | 2.87% | 9.00% | 4.33% | 8.07% | 3.00% | 11.07% | |
| 2 | CMS Energy Corp. | 3.05% | 6.97% | 4.33% | 6.44% | 3.16% | 9.60% | |
| 3 | Ameren | 3.05% | 6.90% | 4.33% | 6.39% | 3.16% | 9.54% | |
| 4 | PSEG | 3.47% | 6.34% | 4.33% | 5.94% | 3.58% | 9.52% | |
| 5 | DTE Energy | 3.35% | 5.49% | 4.33% | 5.26% | 3.44% | 8.70% | |
| 6 | OGE Energy | 3.82% | 4.70% | 4.33% | 4.63% | 3.91% | 8.54% | |
| 7 | Exelon | 3.33% | 4.30% | 4.33% | 4.31% | 3.40% | 7.71% | |
| 8 | Black Hills | 3.26% | 4.32% | 4.33% | 4.32% | 3.33% | 7.65% | |
| 9 | Edison International | 3.73% | 3.44% | 4.33% | 3.62% | 3.79% | 7.41% | |
| 10 | PNM Resources | 2.73% | 4.45% | 4.33% | 4.43% | 2.79% | 7.22% | |
| 11 | El Paso Electric | 2.49% | 4.70% | 4.33% | 4.63% | 2.55% | 7.17% | |
| 12 | NorthWestern Corp. | 3.89% | 2.45% | 4.33% | 2.83% | 3.94% | 6.76% | |
| 13 | IDACORP, Inc. | 2.54% | 3.40% | 4.33% | 3.59% | 2.58% | 6.17% | Low |
| 14 | Entergy | 4.42% | neg | 4.33% | | | | Low |
| 15 | FirstEnergy Corp. | 4.07% | neg | 4.33% | | | | Low |

| | |
|---|---|
| Moody's Baa Utility Bond Yield | 4.68% |
| CAPM Risk Premium | 10.07% |
| Low-End Outlier Test | 6.69% |
| Median Incl. Utilities Excl. w/ Outlier Test | 7.71% |
| High-End Outlier Test | 15.42% |
| Median | 8.12% |

### C. **CAPM**

| Line | Company | IBES Cost of Equity (Rm) | Risk-free Rate | Risk Premium | Beta | Unadjusted Ke | Market Cap. | Size Adjustment | Implied Cost of Equity | Outliers |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Otter Tail Corp. | 13.15% | 3.08% | 10.07% | 0.718 | 10.31% | $1,878 | 1.63% | 11.94% | |
| 2 | El Paso Electric | 13.15% | 3.08% | 10.07% | 0.6431 | 9.56% | $2,321 | 1.63% | 11.19% | |
| 3 | Black Hills | 13.15% | 3.08% | 10.07% | 0.6381 | 9.51% | $3,069 | 1.36% | 10.87% | |
| 4 | OGE Energy | 13.15% | 3.08% | 10.07% | 0.671 | 9.84% | $7,126 | 0.83% | 10.67% | |
| 5 | PNM Resources | 13.15% | 3.08% | 10.07% | 0.601 | 9.13% | $3,087 | 1.36% | 10.49% | |
| 6 | IDACORP, Inc. | 13.15% | 3.08% | 10.07% | 0.6347 | 9.47% | $4,927 | 0.86% | 10.33% | |
| 7 | NorthWestern Corp. | 13.15% | 3.08% | 10.07% | 0.5635 | 8.75% | $2,894 | 1.36% | 10.11% | |
| 8 | FirstEnergy Corp. | 13.15% | 3.08% | 10.07% | 0.6333 | 9.46% | $18,170 | 0.55% | 10.01% | |
| 9 | Entergy | 13.15% | 3.08% | 10.07% | 0.5811 | 8.93% | $15,250 | 0.55% | 9.48% | |
| 10 | DTE Energy | 13.15% | 3.08% | 10.07% | 0.5605 | 8.72% | $19,524 | 0.55% | 9.27% | |
| 11 | Edison International | 13.15% | 3.08% | 10.07% | 0.5508 | 8.63% | $21,719 | 0.55% | 9.18% | |
| 12 | Ameren | 13.15% | 3.08% | 10.07% | 0.5342 | 8.46% | $15,270 | 0.55% | 9.01% | |
| 13 | PSEG | 13.15% | 3.08% | 10.07% | 0.6172 | 9.30% | $25,943 | -0.30% | 9.00% | |
| 14 | CMS Energy Corp. | 13.15% | 3.08% | 10.07% | 0.5148 | 8.26% | $13,687 | 0.55% | 8.81% | |
| 15 | Exelon | 13.15% | 3.08% | 10.07% | 0.5448 | 8.57% | $41,350 | -0.30% | 8.27% | |

| | |
|---|---|
| Moody's Baa Utility Bond Yield | 4.68% |
| CAPM Risk Premium | 10.07% |
| Low-End Outlier Test | 6.69% |
| Median Incl. Utilities Excl. w/ Outlier Test | 10.01% |
| High-End Outlier Test | 20.02% |
| Median | 10.01% |

Docket No. ER18-1639-000                                                    - 71 -

D.    **Risk Premium**

       1.    **Result**

| Current Equity Risk Premium | |
|---|---|
| Average Yield Over Study Period | 5.58% |
| Baa Utility Bond Yield | 4.68% |
| Change in Bond Yield | -0.90% |

| | |
|---|---|
| Risk Premium/Interest Rate Relationship | -0.5880 |
| Adjustment to Average Risk | 0.53% |

| | |
|---|---|
| Average Risk Premium over Study Period | 4.64% |
| **Adjusted Risk Premium** | **5.17%** |

| Implied Cost of Equity | |
|---|---|
| Baa Utility Bond Yield | 4.68% |
| Adjusted Equity Risk Premium | 5.17% |
| **Risk Premium Cost of Equity** | **9.85%** |

       2.    **Case List**

| Docket No. | Utility | Date | Base ROE | Baa Bond Yield | Implied Risk Premium |
|---|---|---|---|---|---|
| ER05-515 | BG&E | Feb-06 | 10.80% | 6.07% | 4.73% |
| ER05-515 | BG&E | Feb-06 | 11.30% | 6.07% | 5.23% |
| ER05-925 | Westar | Jun-06 | 10.80% | 6.36% | 4.44% |
| ER07-284 | SDG&E | Feb-07 | 11.35% | 6.14% | 5.21% |
| ER06-787 | Idaho Pwr | May-07 | 10.70% | 6.15% | 4.55% |
| ER06-1320 | Wisconsin Elec. Pwr | May-07 | 11.00% | 6.15% | 4.85% |
| ER06-1549 | Duquesne | Sep-07 | 10.90% | 6.41% | 4.49% |
| ER07-583 | Commonwealth Edison | Sep-07 | 11.00% | 6.41% | 4.59% |
| ER08-92 | VEPCO | Oct-07 | 10.90% | 6.43% | 4.47% |
| ER08-374 | Atlantic Path | Nov-07 | 10.65% | 6.44% | 4.21% |
| ER08-396 | Westar | Nov-07 | 10.80% | 6.44% | 4.36% |
| ER08-413 | Startrans IO | Nov-07 | 10.65% | 6.44% | 4.21% |
| ER08-375 | So. Cal Edison (a) | Nov-07 | 10.55% | 6.44% | 4.11% |
| ER08-686 | Pepco Holdings | Jan-08 | 11.30% | 6.41% | 4.89% |
| ER07-562 | Allegheny | Feb-08 | 11.20% | 6.42% | 4.78% |
| ER07-1142 | Ariz. Pub. Service | Apr-08 | 10.75% | 6.54% | 4.21% |

| ER08-1207 | VEPCO | May-08 | 10.90% | 6.62% | 4.28% |
|---|---|---|---|---|---|
| ER08-1402 | Duqesne | Jun-08 | 10.90% | 6.69% | 4.21% |
| ER08-1423 | Pepco Holdings | Jun-08 | 10.80% | 6.69% | 4.11% |
| ER09-35/36 | Tallgrass / Prairie Wind | Jul-08 | 10.80% | 6.80% | 4.00% |
| ER09-249 | Public Service Elec. & Gas | Sep-08 | 11.18% | 6.94% | 4.24% |
| ER09-187 | SoCal Edison (b) | Sep-08 | 10.04% | 6.94% | 3.10% |
| ER09-548 | ITC Great Plains | Sep-08 | 10.66% | 6.94% | 3.72% |
| ER09-75 | Pioneer | Sep-08 | 10.54% | 6.94% | 3.60% |
| ER08-1584 | Black Hlls | Nov-08 | 10.80% | 7.60% | 3.20% |
| ER09-745 | Baltimore Gas & Elec. | Dec-08 | 10.80% | 7.80% | 3.00% |
| ER07-1069 | AEP - SPP Zone | Jan-09 | 10.70% | 7.95% | 2.75% |
| ER09-681 | Green Power Express | Jan-09 | 10.78% | 7.95% | 2.83% |
| ER08-281 | Oklahoma Gas & Elec. | Mar-09 | 10.60% | 8.22% | 2.38% |
| ER08-1457 | PPL Elec. Utilities Corp. | Apr-09 | 11.10% | 8.13% | 2.97% |
| ER08-1457 | PPL Elec. Utilities Corp. | Apr-09 | 11.14% | 8.13% | 3.01% |
| ER08-1588 | Kentucky Utilities Co. | Apr-09 | 11.00% | 8.13% | 2.87% |
| ER08-552 | Niagara Mohawk | Jul-09 | 11.00% | 7.62% | 3.38% |
| ER08-313 | Southwestern Public Service Co. | Aug-09 | 10.77% | 7.39% | 3.38% |
| ER09-628 | National Grid Generation LLC | Sep-09 | 10.75% | 7.08% | 3.67% |
| ER10-160 | So Cal Edison | Sep-09 | 10.33% | 7.08% | 3.25% |
| ER08-1329 | AEP - PJM Zone | Mar-10 | 10.99% | 6.20% | 4.79% |
| ER10-230 | Kansas City Power & Light Co. | Aug-10 | 10.60% | 6.05% | 4.56% |
| ER10-355 | AEP Transcos - PJM | Aug-10 | 10.99% | 6.05% | 4.95% |
| ER10-355 | AEP Transcos - SPP | Aug-10 | 10.70% | 6.05% | 4.66% |
| ER11-1952 | So. Cal Edison | Sep-10 | 10.30% | 5.93% | 4.37% |
| EL11-13 | Atlantic Grid Operations | Oct-10 | 10.09% | 5.84% | 4.26% |
| ER11-2895 | Duke Energy Carolinas | Oct-10 | 10.20% | 5.84% | 4.37% |
| ER11-2377 | Northern Pass Tx | Nov-10 | 10.40% | 5.79% | 4.62% |
| ER10-1377 | Northern States Power Co. (MN) | Mar-11 | 10.40% | 5.94% | 4.46% |
| ER10-516 | South Carolina Electric and Gas | Apr-11 | 10.55% | 6.00% | 4.55% |

| ER10-992 | Northern States Power Co. | Apr-11 | 10.20% | 6.00% | 4.20% |
|---|---|---|---|---|---|
| ER11-4069 | RITELine | May-11 | 9.93% | 5.98% | 3.95% |
| ER12-296 | PSEG | Aug-11 | 11.18% | 5.71% | 5.47% |
| ER08-386 | PATH | Sep-11 | 10.40% | 5.57% | 4.83% |
| ER11-2560 | Entergy Arkansas, Inc. | Dec-11 | 10.20% | 5.21% | 4.99% |
| ER12-2300 | PSCo | Mar-12 | 10.25% | 5.08% | 5.18% |
| ER11-2853 | PSCo | Mar-12 | 10.10% | 5.08% | 5.03% |
| ER11-2853 | PSCo | Mar-12 | 10.40% | 5.08% | 5.33% |
| ER12-1378 | Cleco | Nov-12 | 10.50% | 4.74% | 5.77% |
| ER12-778 | Puget Sound Energy | Jan-13 | 9.80% | 4.65% | 5.16% |
| ER12-778 | Puget Sound Energy | Jan-13 | 10.30% | 4.65% | 5.66% |
| ER12-2554 | Transource Missouri | Jan-13 | 9.80% | 4.65% | 5.16% |
| ER11-3643 | PacifiCorp Inc. | Feb-13 | 9.80% | 4.62% | 5.18% |
| ER12-1650 | Maine Public Service Co. | Feb-13 | 9.75% | 4.62% | 5.13% |
| ER11-3697 | SoCal Edison | Jul-13 | 9.30% | 4.82% | 4.49% |
| ER13-941 | San Diego Gas and Electric | Jan-14 | 9.55% | 5.22% | 4.33% |
| ER12-1589 | PSCo | Aug-14 | 9.72% | 4.76% | 4.96% |
| ER12-91 | Duke Energy Ohio | Sep-14 | 10.88% | 4.73% | 6.15% |
| ER13-1508 | Entergy | Nov-14 | 10.37% | 4.71% | 5.66% |
| EL12-101 | Niagara Mohawk | Jan-15 | 9.80% | 4.66% | 5.14% |
| ER13-685 | Public Service Company New Mexico | Feb-15 | 10.00% | 4.62% | 5.38% |
| ER14-1661 | MidAmerican Central California | Mar-15 | 9.80% | 4.58% | 5.22% |
| EL14-93 | Westar Energy | May-15 | 9.80% | 4.58% | 5.22% |
| ER15-303 | American Transmission Systems, Inc. | Jun-15 | 9.88% | 4.65% | 5.23% |
| EL12-39 | Duke Energy Florida | Jun-15 | 10.00% | 4.65% | 5.35% |
| ER15-303 | American Transmission Systems, Inc. | Jun-15 | 10.56% | 4.65% | 5.91% |
| EL14-12 | MISO First Complaint | Jun-15 | 10.02% | 4.65% | 5.37% |
| ER14-192 | SPS | Jul-15 | 10.00% | 4.79% | 5.21% |
| ER13-2428 | Kentucky Utilities | Jul-15 | 10.25% | 4.79% | 5.46% |
| ER14-2751 | XEST | Sep-15 | 10.20% | 5.07% | 5.13% |
| EL15-27 | BG&E (Complaint) | Oct-15 | 10.00% | 5.23% | 4.77% |

| ER15-572 | New York Transco LLC | Oct-15 | 9.50% | 5.23% | 4.27% |
|---|---|---|---|---|---|
| ER15-2237 | Kanstar Transmission LLC | Dec-15 | 9.80% | 5.41% | 4.39% |
| ER15-2114 | Transource West Virginia | Dec-15 | 10.00% | 5.41% | 4.59% |
| EL15-45 | MISO Second Complaint | Dec-15 | 10.05% | 5.41% | 4.64% |
| ER15-1809 | ATX Southwest | Jan-16 | 9.90% | 5.46% | 4.45% |
| ER15-958 | Transource Kansas, LLC | Mar-16 | 9.80% | 5.41% | 4.39% |
| ER15-2324 | MRES Subset | Jun-16 | 9.60% | 4.95% | 4.65% |
| EL16-30 | Duke Energy Carolinas | Jul-16 | 10.00% | 4.73% | 5.27% |
| ER15-1976 | East River | Jul-16 | 9.60% | 4.73% | 4.87% |
| ER15-1682 | TransCanyon DCR, LLC | Jul-16 | 9.80% | 4.73% | 5.07% |
| ER15-2069 | NorthWestern Corp | Jul-16 | 9.65% | 4.73% | 4.92% |
| ER15-2239 | NEET West | Aug-16 | 9.70% | 4.55% | 5.15% |
| ER16-453 | NTD | Aug-16 | 9.85% | 4.55% | 5.30% |
| ER16-835 | NYPA | Aug-16 | 8.95% | 4.55% | 4.40% |
| ER15-2954 | South Central MCN | Sep-16 | 9.80% | 4.41% | 5.39% |
| ER15-1775 | Basin Electric | Sep-16 | 9.60% | 4.41% | 5.19% |
| ER16-204 | Tri-State | Jan-17 | 9.30% | 4.48% | 4.82% |
| ER16-209 | Central Power | Feb-17 | 9.50% | 4.54% | 4.96% |
| ER16-1774 | Western Farmers | Feb-17 | 8.77% | 4.54% | 4.23% |
| ER16-1546 | Arkansas Electric | Feb-17 | 8.00% | 4.54% | 3.46% |
| ER15-1429 | Emera Maine | May-17 | 9.60% | 4.60% | 5.00% |
| ER15-572 | New York Transco LLC | Jul-17 | 9.65% | 4.48% | 5.17% |
| ER17-426 | Denison | Aug-17 | 9.60% | 4.42% | 5.18% |
| ER17-856 | Rockland Electric Co | Aug-17 | 9.50% | 4.42% | 5.08% |
| ER17-211 | Mid-Atlantic Interstate Transmission | Sep-17 | 9.80% | 4.36% | 5.44% |
| ER17-419 | Transource PA/MD | Sep-17 | 9.90% | 4.36% | 5.54% |
| ER16-2720 | NEET Southwest | Nov-17 | 9.80% | 4.26% | 5.54% |
| ER17-1610 | Mountrail-Willams | Nov-17 | 9.60% | 4.26% | 5.34% |
| ER17-428 | Vermillion | Nov-17 | 9.60% | 4.26% | 5.34% |
| ER16-2716 | NEET MidAtlantic | Feb-18 | 9.60% | 4.23% | 5.37% |
| ER17-706 | GridLiance West Transco LLC | Feb-18 | 9.60% | 4.23% | 5.37% |
| ER18-1202 | AEP East Companies | Feb-18 | 9.85% | 4.23% | 5.62% |

| ER17-135 | DesertLink, LLC | Mar-18 | 9.30% | 4.28% | 5.02% |
| ER16-2719 | NEET New York | Apr-18 | 9.65% | 4.33% | 5.32% |

### 3.    Baa Bond Yields

| Month | Moody's Baa Utility Bond Yield (Monthly Average) | 6-Month Average |
| --- | --- | --- |
| Jan-04 | 6.47% | |
| Feb-04 | 6.28% | |
| Mar-04 | 6.12% | |
| Apr-04 | 6.46% | |
| May-04 | 6.75% | |
| Jun-04 | 6.84% | 6.49% |
| Jul-04 | 6.67% | 6.52% |
| Aug-04 | 6.45% | 6.55% |
| Sep-04 | 6.27% | 6.57% |
| Oct-04 | 6.17% | 6.53% |
| Nov-04 | 6.16% | 6.43% |
| Dec-04 | 6.10% | 6.30% |
| Jan-05 | 5.95% | 6.18% |
| Feb-05 | 5.76% | 6.07% |
| Mar-05 | 6.01% | 6.02% |
| Apr-05 | 5.95% | 5.99% |
| May-05 | 5.88% | 5.94% |
| Jun-05 | 5.70% | 5.87% |
| Jul-05 | 5.81% | 5.85% |
| Aug-05 | 5.80% | 5.86% |
| Sep-05 | 5.83% | 5.83% |
| Oct-05 | 6.08% | 5.85% |
| Nov-05 | 6.19% | 5.90% |
| Dec-05 | 6.14% | 5.97% |
| Jan-06 | 6.06% | 6.02% |
| Feb-06 | 6.11% | 6.07% |
| Mar-06 | 6.26% | 6.14% |
| Apr-06 | 6.54% | 6.22% |
| May-06 | 6.59% | 6.28% |
| Jun-06 | 6.61% | 6.36% |
| Jul-06 | 6.61% | 6.45% |
| Aug-06 | 6.43% | 6.51% |
| Sep-06 | 6.26% | 6.51% |
| Oct-06 | 6.24% | 6.46% |

| | | |
|---|---|---|
| Nov-06 | 6.04% | 6.37% |
| Dec-06 | 6.05% | 6.27% |
| Jan-07 | 6.16% | 6.20% |
| Feb-07 | 6.10% | 6.14% |
| Mar-07 | 6.10% | 6.12% |
| Apr-07 | 6.24% | 6.12% |
| May-07 | 6.23% | 6.15% |
| Jun-07 | 6.54% | 6.23% |
| Jul-07 | 6.49% | 6.28% |
| Aug-07 | 6.51% | 6.35% |
| Sep-07 | 6.45% | 6.41% |
| Oct-07 | 6.36% | 6.43% |
| Nov-07 | 6.27% | 6.44% |
| Dec-07 | 6.51% | 6.43% |
| Jan-08 | 6.35% | 6.41% |
| Feb-08 | 6.60% | 6.42% |
| Mar-08 | 6.68% | 6.46% |
| Apr-08 | 6.81% | 6.54% |
| May-08 | 6.79% | 6.62% |
| Jun-08 | 6.93% | 6.69% |
| Jul-08 | 6.97% | 6.80% |
| Aug-08 | 6.98% | 6.86% |
| Sep-08 | 7.15% | 6.94% |
| Oct-08 | 8.58% | 7.23% |
| Nov-08 | 8.98% | 7.60% |
| Dec-08 | 8.13% | 7.80% |
| Jan-09 | 7.90% | 7.95% |
| Feb-09 | 7.74% | 8.08% |
| Mar-09 | 8.00% | 8.22% |
| Apr-09 | 8.03% | 8.13% |
| May-09 | 7.76% | 7.93% |
| Jun-09 | 7.30% | 7.79% |
| Jul-09 | 6.89% | 7.62% |
| Aug-09 | 6.36% | 7.39% |
| Sep-09 | 6.12% | 7.08% |
| Oct-09 | 6.14% | 6.76% |
| Nov-09 | 6.18% | 6.50% |
| Dec-09 | 6.26% | 6.33% |
| Jan-10 | 6.16% | 6.20% |
| Feb-10 | 6.25% | 6.19% |
| Mar-10 | 6.22% | 6.20% |

Document Accession #: 20210715-3076     Filed Date: 07/15/2021

| | | |
|---|---|---|
| Apr-10 | 6.19% | 6.21% |
| May-10 | 6.15% | 6.21% |
| Jun-10 | 6.18% | 6.19% |
| Jul-10 | 5.98% | 6.16% |
| Aug-10 | 5.55% | 6.05% |
| Sep-10 | 5.53% | 5.93% |
| Oct-10 | 5.62% | 5.84% |
| Nov-10 | 5.85% | 5.79% |
| Dec-10 | 6.04% | 5.76% |
| Jan-11 | 6.06% | 5.78% |
| Feb-11 | 6.10% | 5.87% |
| Mar-11 | 5.97% | 5.94% |
| Apr-11 | 5.98% | 6.00% |
| May-11 | 5.74% | 5.98% |
| Jun-11 | 5.67% | 5.92% |
| Jul-11 | 5.70% | 5.86% |
| Aug-11 | 5.22% | 5.71% |
| Sep-11 | 5.11% | 5.57% |
| Oct-11 | 5.24% | 5.45% |
| Nov-11 | 4.93% | 5.31% |
| Dec-11 | 5.07% | 5.21% |
| Jan-12 | 5.06% | 5.11% |
| Feb-12 | 5.02% | 5.07% |
| Mar-12 | 5.13% | 5.08% |
| Apr-12 | 5.11% | 5.05% |
| May-12 | 4.97% | 5.06% |
| Jun-12 | 4.91% | 5.03% |
| Jul-12 | 4.85% | 5.00% |
| Aug-12 | 4.88% | 4.98% |
| Sep-12 | 4.81% | 4.92% |
| Oct-12 | 4.54% | 4.83% |
| Nov-12 | 4.42% | 4.74% |
| Dec-12 | 4.56% | 4.68% |
| Jan-13 | 4.66% | 4.65% |
| Feb-13 | 4.74% | 4.62% |
| Mar-13 | 4.72% | 4.61% |
| Apr-13 | 4.49% | 4.60% |
| May-13 | 4.65% | 4.64% |
| Jun-13 | 5.08% | 4.72% |
| Jul-13 | 5.21% | 4.82% |
| Aug-13 | 5.28% | 4.91% |

| Sep-13 | 5.31% | 5.00% |
|--------|-------|-------|
| Oct-13 | 5.17% | 5.12% |
| Nov-13 | 5.24% | 5.22% |
| Dec-13 | 5.25% | 5.24% |
| Jan-14 | 5.09% | 5.22% |
| Feb-14 | 5.01% | 5.18% |
| Mar-14 | 5.00% | 5.13% |
| Apr-14 | 4.85% | 5.07% |
| May-14 | 4.69% | 4.98% |
| Jun-14 | 4.73% | 4.90% |
| Jul-14 | 4.66% | 4.82% |
| Aug-14 | 4.65% | 4.76% |
| Sep-14 | 4.79% | 4.73% |
| Oct-14 | 4.67% | 4.70% |
| Nov-14 | 4.75% | 4.71% |
| Dec-14 | 4.70% | 4.70% |
| Jan-15 | 4.39% | 4.66% |
| Feb-15 | 4.44% | 4.62% |
| Mar-15 | 4.51% | 4.58% |
| Apr-15 | 4.51% | 4.55% |
| May-15 | 4.91% | 4.58% |
| Jun-15 | 5.13% | 4.65% |
| Jul-15 | 5.22% | 4.79% |
| Aug-15 | 5.23% | 4.92% |
| Sep-15 | 5.42% | 5.07% |
| Oct-15 | 5.47% | 5.23% |
| Nov-15 | 5.57% | 5.34% |
| Dec-15 | 5.55% | 5.41% |
| Jan-16 | 5.49% | 5.46% |
| Feb-16 | 5.28% | 5.46% |
| Mar-16 | 5.12% | 5.41% |
| Apr-16 | 4.75% | 5.29% |
| May-16 | 4.60% | 5.13% |
| Jun-16 | 4.47% | 4.95% |
| Jul-16 | 4.16% | 4.73% |
| Aug-16 | 4.20% | 4.55% |
| Sep-16 | 4.27% | 4.41% |
| Oct-16 | 4.34% | 4.34% |
| Nov-16 | 4.64% | 4.35% |
| Dec-16 | 4.79% | 4.40% |
| Jan-17 | 4.62% | 4.48% |

Document Accession #: 20210715-3076    Filed Date: 07/15/2021

| Feb-17 | 4.58% | 4.54% |
|---|---|---|
| Mar-17 | 4.62% | 4.60% |
| Apr-17 | 4.51% | 4.63% |
| May-17 | 4.50% | 4.60% |
| Jun-17 | 4.32% | 4.53% |
| Jul-17 | 4.36% | 4.48% |
| Aug-17 | 4.23% | 4.42% |
| Sep-17 | 4.24% | 4.36% |
| Oct-17 | 4.26% | 4.32% |
| Nov-17 | 4.16% | 4.26% |
| Dec-17 | 4.14% | 4.23% |
| Jan-18 | 4.18% | 4.20% |
| Feb-18 | 4.42% | 4.23% |
| Mar-18 | 4.52% | 4.28% |
| Apr-18 | 4.58% | 4.33% |
| May-18 | 4.71% | 4.43% |
| Jun-18 | 4.71% | 4.52% |
| Jul-18 | 4.67% | 4.60% |
| Aug-18 | 4.64% | 4.64% |
| Sep-18 | 4.74% | 4.68% |

Document Accession #: 20210715-3076     Filed Date: 07/15/2021

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Constellation Mystic Power, LLC                    Docket No.      ER18-1639-000

(Issued July 15, 2021)

DANLY, Commissioner, *concurring*:

1.      I concur in today's order setting the base return on equity (ROE) for Constellation Mystic Power, LLC (Mystic) at 9.33% as just and reasonable.

2.      I am concerned, however, with that part of today's order that excludes Avangrid, Inc. (Avangrid) from the proxy group used in the discounted cash flow and capital-asset pricing model analyses employed in part by the Commission to arrive at the 9.33% ROE.[1] In my view, the fact that Iberdrola, S.A. (Iberdrola) owned 81.5% of Avangrid during the study period does not, in itself, justify Avangrid's exclusion from the proxy group.  I believe that those considering investment in Avangrid were more likely to have considered Avangrid's operations, revenues, expenses, and risk profile—which support the inclusion of Avangrid in the proxy group—than they were to have considered Iberdrola's ownership interest in Avangrid.

3.      This concern does not lead me to dissent from today's order.  I do not believe, based on the specific facts of this case, that the exclusion of Avangrid from the proxy group rendered the resulting ROE unjust or unreasonable.  However, I can imagine future cases in which such an exclusion may well do so and reserve the right to object at that time, should the facts so require.

        For these reasons, I respectfully concur.


_____
James P. Danly
Commissioner


---

[1] *Constellation Mystic Power, LLC*, 176 FERC ¶ 61,019, at PP 155-156 (2021).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Constellation Mystic Power, LLC                    Docket No.       ER18-1639-000

(Issued July 15, 2021)

CLEMENTS, Commissioner, *dissenting*:

1.      I dissent from today's order because I believe the Commission's current return on equity (ROE) policy applies a flawed methodology that does not adequately protect consumers and does not yield just and reasonable rates.  I explained my concerns with our current policy in a recent dissent,[1] so I will not repeat them all here.  This proceeding and the parties' briefs do, however, highlight again the significant flaws inherent in the Commission's use of the Risk Premium model.[2]

2.      Few Commission policies impact consumers as much as our policy for setting ROEs.  While today's order addresses the ROE portion of cost-based compensation to keep the Mystic units online for two additional years, our ROE policy extends to all cost-based rates within our jurisdiction, including transmission rates.  In the coming years, our nation's electric grid will require tremendous investment in transmission—an increasingly urgent need in the face of frequent extreme weather, drought and fire risk across the country.  Smart transmission investment not only enhances reliability and resilience, but it unlocks low-cost power supply, allows more efficient use of existing infrastructure, and minimizes the cost of meeting changing customer demand and public policies.  This investment can ultimately be a net win for consumers.  But the value

---

[1] *Entergy Arkansas, Inc.*, Opinion No. 575, 175 FERC ¶ 61,136 (2021) (Clements, Comm'r, dissenting).

[2] *See, e.g.,* Massachusetts AG Initial Brief at 11-12 (pointing to the Commission's multiple prior determinations that the Risk Premium model is insufficiently reliable to use for setting ROEs); Connecticut Parties Initial Brief at 20; Massachusetts AG Reply Brief at 5 n.21, 15 (arguing that the Risk Premium model's reliance on historical ROEs creates analytical circularity); Massachusetts AG Initial Brief at 10; Massachusetts AG Reply Brief at 16; Connecticut Parties Initial Brief at 21-22 (arguing that the Risk Premium model, as applied per Opinion No. 569-A, inappropriately relies on past settlement ROEs on which a record may not have been developed, on which the Commission did not make an explicit just and reasonable finding, and which may not reflect the actual market cost of equity due to settlement dynamics or a failure to analyze contemporaneous market conditions).

proposition for consumers is in no small part dependent on this Commission's rigorous scrutiny of the rates charged for transmission service, of which ROE is a central component.

3.      Given this context, I believe the Commission must revisit its existing ROE policy. I appreciate that this policy has been unsettled for years, a state that increases investment uncertainty and extends litigation.  To be sure, I share the goal of a stable ROE policy that will speed rate proceedings and allow for timely ROE updates as market conditions change.  But we should not double down on the desire for near-term stability to the detriment of consumer protection, and I worry our current ROE policy does just that.


          For these reasons, I respectfully dissent.


_____
Allison Clements
Commissioner

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Braintree Electric Light Department, | ) | |
| Concord Municipal Light Plant, | ) | |
| Georgetown Municipal Light Department, | ) | |
| Hingham Municipal Lighting Plant, | ) | Case No. _____ |
| Littleton Electric Light Department, | ) | |
| Middleborough Gas & Electric Department, | ) | |
| Middleton Electric Light Department, | ) | |
| Norwood Light & Broadband Department, | ) | |
| Reading Municipal Light Department, | ) | |
| Taunton Municipal Lighting Plant, | ) | |
| Wellesley Municipal Light Plant, and | ) | |
| Westfield Gas & Electric Department | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| Respondent. | ) | |

## EXHIBIT NO. 2
### TO PETITION FOR REVIEW

**Notice of Denial of Rehearings by Operation of Law and Providing for Further Consideration in *Constellation Mystic Power, LLC*, Docket No. ER18-1639-010, 176 FERC ¶ 62,127 (issued Sept. 13, 2021) (the "September 13 Notice")**

176 FERC ¶ 62,127
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Constellation Mystic Power, LLC                         Docket No.  ER18-1639-010

NOTICE OF DENIAL OF REHEARINGS BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(September 13, 2021)

Rehearings have been timely requested of the Commission's order issued on July 15, 2021, in this proceeding.  *Constellation Mystic Power*, *LLC*, 176 FERC ¶ 61,019 (2021).  In the absence of Commission action on the requests for rehearing within 30 days from the date the requests were filed, the requests for rehearing (and any timely requests for rehearing filed subsequently)[1] may be deemed denied.  16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2020); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the rehearing requests of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section.  As also provided in 16 U.S.C. § 825*l*(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.  As provided in 18 C.F.R. § 385.713(d), no answers to the rehearing requests will be entertained.

Debbie-Anne A. Reese,
Deputy Secretary.

---

[1] *See San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs. Into Mkts. Operated by Cal. Indep. Sys. Operator & Cal. Power Exch.*, 95 FERC ¶ 61,173 (2001).

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Braintree Electric Light Department, | ) | |
| Concord Municipal Light Plant, | ) | |
| Georgetown Municipal Light Department, | ) | |
| Hingham Municipal Lighting Plant, | ) | |
| Littleton Electric Light & Water Department, | ) | |
| Middleborough Gas & Electric Department, | ) | Case No. _____ |
| Middleton Electric Light Department, | ) | |
| Norwood Light & Broadband Department, | ) | |
| Reading Municipal Light Department, | ) | |
| Taunton Municipal Lighting Plant, | ) | |
| Wellesley Municipal Light Plant, and | ) | |
| Westfield Gas & Electric Department | ) | |
| | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| Respondent. | ) | |

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Rules of this Court, Petitioners Braintree Electric Light Department ("Braintree"), Concord Municipal Light Plant ("Concord"), Georgetown Municipal Light Department ("Georgetown"), Hingham Municipal Lighting Plant ("Hingham"), Littleton Electric Light & Water Department ("Littleton"),

Middleborough Gas & Electric Department ("Middleborough"), Middleton Electric Light Department ("Middleton"), Norwood Light & Broadband Department ("Norwood"), Reading Municipal Light Department ("Reading"), Taunton Municipal Lighting Plant ("Taunton"), and Wellesley Municipal Light Plant ("Wellesley"), and Westfield Gas & Electric Department ("Westfield") state that each of them is a municipal light plant, organized and existing under the laws of the Commonwealth of Massachusetts (MGL c. 164, §§ 34-69, as amended) and a political subdivision of the Commonwealth of Massachusetts. As political subdivisions of the Commonwealth of Massachusetts, none of these Petitioners is a "nongovernmental corporate entity" subject to the requirements of Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1.

[Remainder of page intentionally left blank]

2

Respectfully submitted,

*/s/ John P. Coyle*

_____

John P. Coyle (Cir. Bar No. 32182)
Duncan & Allen LLP
Suite 700
1730 Rhode Island Avenue, N.W.
Washington, D.C. 20036-3115
Telephone:      (202) 289-8400
Facsimile:      (202) 289-8450
E-mail:   jpc@duncanallen.com

Counsel for Braintree, Concord,
Georgetown, Hingham, Littleton,
Middleborough, Middleton, Norwood,
Reading, Taunton, Wellesley, and
Westfield (the "Eastern New England
Consumer-Owned Systems")

Dated at Washington, D.C.
this 10th day of November 2021.

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Braintree Electric Light Department,                )
Concord Municipal Light Plant,                      )
Georgetown Municipal Light Department,              )
Hingham Municipal Lighting Plant,                   )      Case No. _____
Littleton Light & Water Department,                 )
Middleborough Gas & Electric Department,            )
Middleton Electric Light Department,                )
Norwood Light & Broadband Department,               )
Reading Municipal Light Department,                 )
Taunton Municipal Lighting Plant,                   )
Wellesley Municipal Light Plant, and                )
Westfield Gas & Electric Department                 )
                                                    )
               Petitioners,                         )
                                                    )
         v.                                         )
                                                    )
Federal Energy Regulatory Commission,               )
                                                    )
               Respondent.                          )

## CERTIFICATE OF SERVICE

Pursuant to Rules 15(c) and 25 of the Federal Rules of Appellate Procedure and Rules 15(a) and 25 of the Circuit Rules for the United States Court of Appeals for the District of Columbia Circuit, I hereby certify that I have served a true and correct copy of the foregoing document, upon the Office of the Secretary and the Office of the Solicitor of the Federal Energy Regulatory Commission:

Ms. Kimberly D. Bose
Secretary
Federal Energy Regulatory
Commission
888 First St., NE
Washington, D.C. 20426

Mr. Robert H. Solomon
Solicitor
Federal Energy Regulatory
Commission
888 First St., NE
Washington, D.C. 20426

In addition, I have served all persons on Commission's service list in the

underlying proceeding, Docket No. ER18-1639-000, *et al*:

**Avangrid Networks, Inc.**
nicholas.cicale@uinet.com
justin.atkins@avangrid.com

**Avangrid Renewables, LLC**
toan.nguyen@avangrid.com

**Capline Corporation**
snovosel@calpine.com
bkruse@calpine.com

**Cavus Energy LLC**
dmccaffrey@cavusenergy.com

**Citizens Energy Corporation**
barbarajost@dwt.com

**Cogentrix Energy Power Management, LLC**
chrissherman@cogentrix.com

**Connecticut Municipal Electric Energy Cooperative**
rkipnis@cmeec.org

**Connecticut Public Utilities Regulatory Authority**
Scott.Strauss@spiegelmcd.com
jeffrey.schwarz@spiegelmcd.com
Clare.Kindall@ct.gov
robert.luysterborghs@ct.gov
seth.hollander@ct.gov
latif.nurani@spiegelmcd.com
robert.luysterborghs@ct.gov

**Consolidated Edison Energy, Inc.**
dannelsj@conedceb.com

**Constellation Mystic Power, LLC**
nsymons@mcguirewoods.com
cfrancis@mcguirewoods.com
jeanne.dworetzky@exeloncorp.com
marianne.alvarez@exeloncorp.com
carrie.allen@exeloncorp.com
kfarrell@mcguirewoods.com

**Dighton Power, LLC**
meghan.gruebner@libertyutilities.com
jdelgado@starwood.com

**Direct Energy Business Marketing, LLC**
mphilips@lspower.com

**Distrigas of Massachusetts LLC**
david.wochner@klgates.com
wkeyser@steptoe.com
mike.oneill@klgates.com

**Dominion Energy Services, Inc.**
wesley.walker@dominionenergy.com

**Electric Power Supply Association**
NancyB@epsa.org

**ENGIE Gas and LNG LLC**
david.wochner@klgates.com
wkeyser@steptoe.com
mike.oneill@klgates.com

**Environmental Defense Fund**
nkaras@edf.org

**Eversource Energy Service Company**
lisa.luftig@eversource.com

**Federal Energy Regulatory Commission**
Michael.Splete@ferc.gov
james.pepper@ferc.gov
matthew.phillips@ferc.gov

**FirstLight Power Resources, Inc.**
marc.silver@firstlightpower.com
SRwejuna@jonesday.com
stephen.hug@bracewell.com

**Gaz Metro LNG, L.P.**
tgriset@preti.com
hugo.sigouin-plasse@energir.com

**Industrial Energy Consumer Group**
tgriset@preti.com

**ISO New England Inc.**
chamlen@iso-ne.com
jhorgan@iso-ne.com
mgulluni@iso-ne.com
LMorrison@iso-ne.com
lmailesmith@iso-ne.com
thompson@wrightlaw.com
swers@wrightlaw.com
collins@wrightlaw.com

4

**LS Power Associates, L.P.**
thoatson@lspower.com
nlevy@mwe.com

**Maine Public Utilities Commission**
eric.j.bryant@maine.gov

**Massachusetts Attorney General Maura Healey**
amb@duncanallen.com
christina.belew@state.ma.us

**Massachusetts Department of Public Utilities**
greggory.wade@mass.gov
krista.hawley@mass.gov

**Massachusetts Municipal Wholesale Electric Company**
Scott.Strauss@spiegelmcd.com
jeffrey.schwarz@spiegelmcd.com
eService@spiegelmcd.com

**Milford Power, LLC**
meghan.gruebner@libertyutilities.com
jdelgado@starwood.com

**Monitoring Analytics, LLC**
jeffrey.mayes@monitoringanalytics.com
Joseph.Bowring@monitoringanalytics.com
Suzette.Krausen@monitoringanalytics.com

**National Grid USA**
daniel.galaburda@nationalgrid.com
michaelkunselman@dwt.com
seanatkins@dwt.com

**New England Local Distribution Companies**
aclair@thompsoncoburn.com
edna.karanian@eversource.com
nallen@thompsoncoburn.com
acontrino@wgeld.org
hartigan@unitil.com
benjamin.collins@eversource.com
jgregg@mccarter.com
justin.atkins@avangrid.com
kchrist@nisource.com
slanglois@ctgcorp.com

**New England Power Generators Association Inc.**
banderson@nepga.org

**New England Power Pool Participants Committee**
dtdoot@daypitney.com
slombardi@daypitney.com
sbrowning@daypitney.com
jfagan@daypitney.com

**New England States Committee on Electricity**
jeffbentz@nescoe.com
jasonmarshall@nescoe.com

**New Hampshire Electric Cooperative, Inc.**
Scott.Strauss@spiegelmcd.com
jeffrey.schwarz@spiegelmcd.com
eService@spiegelmcd.com

**New Hampshire Office of Consumer Advocate**
donald.kreis@oca.nh.gov

**New Hampshire Public Utilities Commission**
David.K.Wiesner@energy.nh.gov
george.mccluskey@puc.nh.gov

**NextEra Energy Resources, LLC**
joel.newton@nee.com
cholahan@foleyhoag.com

**NRG Power Marketing LLC and GenOn Energy Management, LLC**
abe.silverman@nrg.com
cortney.slager@nrg.com
jennifer.hsia@nrg.com

**Phyllis G. Kimmel Law Office PLLC**
pkimmel@pgklawoffice.com

**PSEG Power LLC**
adrian.newall@pseg.com
cara.lewis@pseg.com

**PSEG Energy Resources & Trade LLC**
adrian.newall@pseg.com
cara.lewis@pseg.com
Raymond.Depillo@pseg.com

**PSEG Power Connecticut LLC**
adrian.newall@pseg.com
cara.lewis@pseg.com
jgordon@cpv.com

**Public Citizen, Inc**
tslocum@citizen.org

**Repsol Energy North America Corporation**
robert.neustaedter@repsol.com
kevin.voelkel@bracewell.com
michael.brooks@bracewell.com

**State of Rhode Island**
nicholas.ucci@energy.ri.gov

**Vermont Department of Public Service**
nicholas.ucci@energy.ri.gov

**Vermont Public Utility Commission**
mary-jo.krolewski@vermont.gov
**Verso Corporation**
rfallon@efenergylaw.com
Steve.brooks@versoco.com

**Vitol Inc.**
catherine.krupka@sutherland.com
rfv@vitol.com
jxw@vitol.com

Respectfully submitted,

/s/ John P. Coyle

_____
John P. Coyle (Cir. Bar No. 32182)
Duncan & Allen LLP
Suite 700
1730 Rhode Island Avenue NW
Washington, D.C.  20036-3115
Telephone:  (202) 289-8400
Email: jpc@duncanallen.com

Counsel for Braintree, Concord,
Georgetown, Hingham, Littleton,
Middleborough, Middleton,
Norwood, Reading, Taunton,
Wellesley, and Westfield (the
"Eastern New England Consumer-
Owned Systems")

Dated at Washington, D.C.
this 10th day of November 2021.

8